RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0334p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

BRETT FITZGERALD GOOCH,

*Defendant-Appellant.*

No. 06-5914

>

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 04-00186—Aleta A. Trauger, District Judge.

Submitted: July 20, 2007

Decided and Filed: August 21, 2007

Before: MARTIN and ROGERS, Circuit Judges; HOOD, District Judge.[*]

_____

**COUNSEL**

**ON BRIEF:** Rayburn McGowan, Jr., Nashville, Tennessee, for Appellant. Darryl A. Stewart, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

_____

**OPINION**

_____

BOYCE F. MARTIN, JR., Circuit Judge. Brett Fitzgerald Gooch was charged in a single-count indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a). The district judge denied Gooch's motion to suppress. Thereafter, Gooch pled guilty but reserved the suppression issue, which is now before this court. For the reasons that follow, we **AFFIRM** the district court's denial of Gooch's motion to suppress.

**I.**

The now-defunct Club Prizm was a nightclub that was open to the public and located in a shopping center at the intersection of Nolensville Road and Old Hickory Boulevard in Nashville, Tennessee. Other businesses in the shopping center included a Laundromat, a liquor store, a hair salon, a paint store, and an Asian grocery store. In addition, the club was behind a Kroger

_____

[*] The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

supermarket that was open twenty-four hours a day.  There was also an apartment complex located on the west side of the club.  Police frequently visited Club Prizm due to complaints about fights, loud music, shootings, and a murder.  In response to increased crime around the club and in the club's parking lot, officers often conducted sweeps of the parking lot to look for contraband such as drugs or weapons.  Police would conduct these sweeps by walking through the aisles of the parking lot and peeking inside cars with flashlights to see if anything could be observed in plain view.  At the suppression hearing, club owner Anthony Fidanza testified to the problems in the club's parking lot and the surrounding neighborhood and stated that the police "made their presence known for the most part for safety to make sure everything was fine, which I welcomed that completely."  Joint App'x at 90.

Fidanza did not own the parking lot; rather, it was a common parking lot to be shared by all of the surrounding businesses.  He had an arrangement with a valet service that worked in the parking lot on the club's busiest nights.  Fidanza did not pay for this service and did not receive any of the money it collected.  The valet service did not actually park patrons' cars.  Instead, orange cones were placed in various parking spaces, and when a customer wished to park in a particular space, the valet would remove the cone and charge the customer to park there.  Prices ran anywhere from $20 to $80 per vehicle, depending on how crowded the club was on that particular night and the location of the spot.  (Apparently, there was a correlation between a patron's status and how close his vehicle was to the club's entrance.)  The valet attended to about forty to fifty spaces in this "VIP area"; customers could park in the "outskirts" of the parking lot for no charge.  In light of the fact that some patrons drove very expensive cars to the club, Fidanza employed some security guards in the valet area to watch the vehicles.  Despite the valet service and security guards, pedestrians who were not club patrons could freely walk through the parking lot, including the VIP area, although few did so.  Further, the police who entered the lot included the VIP area in their sweeps.  According to Darryl Tyce, a security worker at Club Prizm, patrons became uneasy about the police presence in the parking lot.

On May 20, 2004, a valet was in the parking lot collecting money from patrons when uniformed officers from the Metropolitan Nashville Police Department ("Metro") arrived in marked patrol cars.  The officers were not asked to leave the premises.  Officer Mark Anderson testified that during this sweep, he approached a Lincoln Town Car parked in the valet area and shined a flashlight straight into the windshield toward the car's floorboard.  Anderson noticed a purple velvet Crown Royal whiskey bag located underneath the driver's seat.  He observed what appeared to be the handle of a firearm sticking out of the bag, and informed the other officers in the area, including Officer Robert Bandish, who also observed the weapon.  At this point, officers did not make any attempt to seize the weapon or open the car.  Instead, Anderson reentered his patrol car and positioned it so he could watch to see whether anyone attempted to enter the Lincoln.  Bandish pulled his patrol car alongside Anderson's car and waited with him.

Meanwhile, Anderson ran the car's license plate to determine the owner of the vehicle.[1]  He discovered that the vehicle belonged to Gooch, that Gooch did not have a valid gun permit or valid driver's license, and that Gooch had an extensive criminal history which included at least one felony conviction.  Anderson pulled up Gooch's mug shot on his laptop so that he would be able to make a positive identification when Gooch exited the club.  After a while, Anderson observed a person matching the mug shot and a female (later identified as Gooch's wife, Seniqua King) enter the Lincoln.  According to Anderson, Gooch got into the driver's side and King got into the passenger's side.  After Gooch started the car and put it into reverse, Anderson, with Bandish at his side,

---

[1] In Tennessee, it is not necessarily a crime for a person to keep a firearm in his or her vehicle.  Therefore, only by determining who possessed the pistol (and thus, whether it was unregistered or the owner was a convicted felon) would Officer Anderson know if a crime was being committed.

approached the car with his gun drawn and demanded that Gooch place the car in park and exit the vehicle.[2]  Gooch complied and was placed under arrest.  Thereafter, officers conducted a search of the vehicle and seized a loaded Hi Point Model C9 9mm pistol.  Gooch told the officers that he owned the gun for protection.  Because Gooch was a convicted felon, he was charged with unlawfully possessing the pistol in violation of 18 U.S.C. §§ 922(g)(1) and 924(a).  Gooch filed a motion to suppress the firearm, which the district court denied on May 12, 2005.

In denying Gooch's motion, the district court explained that the real inquiry in this case was whether Gooch had a reasonable expectation of privacy in the section of the parking lot where he parked his car.  Referring to the testimony and photographs admitted into evidence, the district judge found that there were two driveways into the parking lot, neither of which were manned.  Nor was there any fencing to block off the area.  With respect to the placement of orange cones in certain places, the district court credited Anderson's testimony that "there was no rhyme, no reason to the cones as to where they were."  Joint App'x at 145.  The district court then explained:

> [M]ost importantly, Mr. Tyce testified that everyone knew that Metro was doing sweeps of this parking lot, including the VIP area.  He testified that when Metro was present, people would come to the door because they were concerned about their cars.  And obviously people knew that these sweeps were going on, and there was no legitimate expectation of privacy. . . . This was a parking lot that was not owned by the owner of this club, really not controlled by the owner of the club.  There were other businesses that used this parking lot, at least the Laundromat which was opened until late at night, that was entitled to use the parking lot.  There was testimony that the public walked right through this parking lot regularly.  There was a Kroger right nearby that was open [twenty-four] hours a day.  There were two or three witnesses that testified that pedestrians were free to walk through this parking lot; they were free to walk through the VIP area of this parking lot.  This was a parking lot for a commercial establishment, several commercial establishments, open for business to the public.  And even at night, when the primary people using this lot were customers of the club, the court finds that there was no reasonable expectation of privacy and that the Metro policemen were validly there on legitimate police business, very legitimate police business, given the history of this club, the activity going on there, and the numerous complaints, and shootings, and so forth, that had taken place there.

*Id.* at 145-46.

The district court held that the officers did not violate the Fourth Amendment because Gooch did not have a legitimate expectation of privacy where the police were conducting sweeps, and his gun was observed in plain view inside his car.  The district court explained that after seeing the gun, the police appropriately did their "due diligence" in researching the owner of the vehicle, so as to determine whether the firearm was lawfully possessed. *Id.* at 149-50.  In addition, the district court commended the police for simply waiting for Gooch to approach the vehicle, rather than first opening the car or entering the club.

On September 27, 2005, Gooch pled guilty to the single count in the indictment.  The parties expressly preserved the suppression issue for appellate review.  On July 3, 2006, Gooch was sentenced to sixty months' imprisonment, to be followed by three years' supervised release.  On July 10, 2006, Gooch appealed the district court's denial of his motion to suppress.

---

[2]King disputed Anderson's account, testifying instead that Gooch had not yet started the car at the time Anderson approached him.  However, even if King's testimony is true, it does not have any legal consequence.

## II.

### A.

When reviewing a district court's denial of a motion to suppress, factual findings are reviewed for clear error and legal conclusions are reviewed *de novo*. *United States v. Moncivais*, 401 F.3d 751, 754 (6th Cir. 2005). Evidence should be viewed in the light most favorable to the district court's conclusion. *United States v. Jones*, 159 F.3d 969, 973 (6th Cir. 1998).

### B.

The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "[C]apacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (citing *Katz v. United States*, 389 U.S. 347, 353 (1967)). Thus, only if Gooch had a reasonable expectation of privacy in the contents of his vehicle that were observable by looking through its windows would the officers' conduct constitute a "search" within the meaning of the Fourth Amendment.

If Gooch did in fact have a reasonable expectation of privacy in the so-called VIP area, then it is of no moment that the pistol was in plain view, for then Gooch could have reasonably expected that officers would not have been in a place where they could view the pistol so plainly. *See Horton v. California*, 496 U.S. 128, 135 (1990) ("What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused." (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971))). On the other hand, if Gooch did not have a reasonable expectation of privacy where he parked his vehicle, then the observation of any contraband in plain view did not constitute a search. *Id.*; *see also Texas v. Brown*, 460 U.S. 730, 740 (1983) ("There is no legitimate expectation of privacy . . . shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." (internal citations omitted)). Further, Anderson's use of a flashlight to illuminate the interior of Gooch's car poses no Fourth Amendment concerns. *See Brown*, 460 U.S. at 739-40.

In order to be afforded protection under the Fourth Amendment, a person must exhibit a subjective expectation of privacy and society must be willing to recognize this expectation as reasonable. *Rakas*, 439 U.S. at 143 n.12; *Katz*, 389 U.S. at 361 (Harlan, J., concurring). "What a person knowingly exposes to the public" is not protected by the Fourth Amendment. *Katz*, 389 U.S. at 351. But, the Supreme Court was careful to point out that "what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id*. Thus, in *Katz*, the Court held that while the glass phone booth from which Katz made his calls was visible to the public, "what he sought to exclude when he entered the booth was not the intruding eye — it was the uninvited ear." *Id*. at 352. Therefore, once Katz shut the phone booth's door and paid his toll, he was reasonable to expect that the contents of his conversations would remain private. *Id*.

In answering whether Gooch had a reasonable expectation here, we look to the facts. While Gooch concedes that the handle of his pistol was in plain view, he questions the officers' authority to be positioned at his car in the first place. Specifically, he contends that his vehicle was parked in an area reserved for paying customers that was not open to the public. Thus, according to Gooch, while perhaps those who parked in the non-valet area of the parking lot did not have a reasonable expectation of privacy with respect to what was within plain view in their cars, those individuals who paid to park in the valet area did.

First, it should be noted that Gooch's characterization of the facts is inaccurate. Gooch's characterization would be more apropos if, for example, this case concerned a private parking garage that required individuals to use a code or card to enter. In that case, one could reasonably argue that the area was not open to the general public, and thus individuals might have a higher expectation of privacy. Here, the situation was quite different, as (1) despite the valet service, the parking lot was neither owned nor controlled by the owner of Club Prizm; (2) the parking lot was shared by several commercial establishments, and the businesses that used the parking lot included a Laundromat that was open late and a Kroger that was open twenty-four hours a day; (3) members of the public regularly walked right through the parking lot, including the VIP area; and (4) club patrons knew that the police were conducting sweeps of the parking lot, including the VIP area. Certainly, these findings were not clearly erroneous, as they were based on photographs and testimony from the evidentiary hearing. In fact, none of these material facts are disputed. Therefore, the only question here is whether, pursuant to the district court's factual findings regarding the parking lot, Gooch's expectation of privacy in his vehicle parked there was a reasonable one.

While Gooch may have paid to park in the segregated VIP area, this area was within a larger parking lot that was shared by several commercial establishments. Further, other than the presence of orange cones demarcating particular parking spots, there was no barrier—i.e., a physical structure, verbal instruction, signage, or any other method—that prevented pedestrians from walking through the VIP area of the parking lot during the hours the valet service was in operation. *See United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984) (finding that defendants did not have a reasonable expectation of privacy where the officer entered a construction company's parking lot which could be characterized as, at best, a "semi-private area," because it was located in a commercial area, was bound on three sides by public streets, was visible from streets to the south and east, and had a fenced gate that was left completely open); *id.* ("[T]here was no indication that the back parking lot was 'private' to the owners or to those specifically authorized to use it.").

Gooch's attempt to align his case with others where this court has found a legitimate expectation of privacy is unavailing. Primarily, he relies on this court's opinions in *United States v. Carriger*, 541 F.2d 545 (6th Cir. 1976), and *United States v. Diaz*, 25 F.3d 392 (6th Cir. 1994). In *Carriger*, an officer without a warrant tried to gain entry into an apartment building owned and resided in by the defendant. 541 F.2d at 548. Both the front and back doors leading to the common area of the building were locked. *Id.* Undeterred, the officer waited a few minutes until workers within the building walked out one of the doors. *Id.* Before the door fully closed, the officer, without permission, slipped through the door and into the building. *Id.* The issue before this court was whether evidence seized in the common area—specifically, on a stairwell near Carriger's apartment—should have been suppressed. *Id.* at 548-59. The answer turned on whether Carriger had a reasonable expectation of privacy in the common area. *Id.* at 549. The court answered in the affirmative, highlighting the fact that the building was locked and could only be opened by a key or buzzer, and therefore, was not accessible to the public. *Id.* at 551.

In *Diaz*, officers located the defendant's car in the parking lot of a motel where he was renting a room. 25 F.3d at 393, 396. A drug-detection dog that was brought over to the car alerted to the presence of drugs, establishing the requisite probable cause of criminal activity. *Id.* at 393-94. Diaz, believing he had no choice, consented to a search. *Id.* at 393. After determining that the dog was trained and reliable, such that his alerting to the drugs was sufficient to establish probable cause, this court turned to Diaz's claim that because his car was parked in a lot reserved for only motel guests, and not the general public, he had a reasonable expectation of privacy; therefore, the dog sniff around his car violated the Fourth Amendment. *Id.* at 396. The court held that motel guests did not have a reasonable expectation of privacy in the motel's parking lot, and rejected Diaz's reliance on *Carriger* "for the simple reason that the officers [in *Diaz*] lawfully could be in the parking lot," whereas in *Carriger*, "the building was not open to the general public except on

permission of the tenants and the agent had neither permission nor a warrant." *Id*. at 397 (citing *Carriger*, 541 F.2d at 550-51).[3]

In the case at bar, Gooch maintains that this case is more analogous to *Carriger*, not *Diaz*, because

> [u]nlike the parking lot in *Diaz* — and like the common area in *Carriger* — the VIP section of Club [Prizm]'s parking lot was accessible only by the express permission of the parking attendant. Payment of a parking fee allowed the Appellant access to an otherwise restricted area. The Appellant clearly intended to remove his vehicle from the general public access and to take advantage of increased security, thereby invoking a higher degree of privacy and increasing the security of his vehicle. Because Officers Anderson and Bandish invaded a designated parking area not open to the general public, they were not in a lawful position to visually inspect the interior of the Appellant's car.

Appellant's Br. at 15.

First, this again is not an accurate depiction of the factual circumstances. While it is true that in order to receive permission to *park his car in a particular spot*, Gooch had to pay the requisite parking fee,[4] nothing at all prohibited others, including police officers, from walking through this so-called "restricted area." There were no physical barriers preventing pedestrians or police from walking through the VIP area, nor did the valets, security, or other club employees try to prevent people from walking through this area.

While Gooch attempts to salvage his argument by explaining that he chose this area due to the "higher degree of privacy" and security, we cannot overlook the fact that the general public was nevertheless allowed to walk through the entire area. Further, club patrons—while they may not have liked it—were aware of the police presence in the parking lot. *See Katz*, 389 U.S. at 351 (explaining that the Fourth Amendment does not protect "[w]hat a person knowingly exposes to the public"). Thus, this case is far more akin to *Diaz* than *Carriger*; in the former, anyone could walk through the motel's parking lot — even non-guests; in the latter, only those with keys or permission could enter the common area. *See also United States v. Morton*, 17 F.3d 911, 913 (6th Cir. 1994) (holding that the officer's discovery and seizure of a gun did not violate the Fourth Amendment where officers lawfully entered a business open to the public and saw the gun in plain view); *United States v. Brandon*, 599 F.2d 112, 113 (6th Cir. 1979) (holding that where officers "entered the used car lot [owned by defendant], looked at the automobile, . . . were never asked to leave or forbidden to look in the windows[, and] [t]his was a commercial establishment open to the public, and the owner's expectations of privacy could not be comparable to those situations involving entrance into a home or breaking into an automobile).

We do not mean to suggest that an individual who parks his or her vehicle in any parking garage or parking lot will necessarily lose all expectations of privacy. There may exist some scenarios in which outside access to a parking garage or lot is so restricted that a reasonable person would not expect a pedestrian or police officer to be able to approach and look into his or her

<hr/>

[3] Of course, the dog sniff in and of itself — like the plain view observation of contraband in this case — did not constitute a search within the meaning of the Fourth Amendment. *Diaz*, 25 F.3d at 396 (citing *United States v. Place*, 462 U.S. 696, 707 (1983)).

[4] It is an open question whether patrons were necessarily required to pay such parking fees anyway, given that Fidanza did not own or control the lot, and the lot was shared by other businesses. Regardless, such an inquiry is not relevant to this appeal.

vehicle. However, speculating on when these cases could arise is outside the scope of this case. Here, members of the public and police officers had access to, and were able to walk through, the VIP area. Additionally, the testimony revealed that patrons parked in this area not only for security purposes, but in some cases for notoriety. We hold that here, Gooch had no reasonable expectation of privacy, and therefore, there was no search within the meaning of the Fourth Amendment.

## C.

Once police lawfully observed the firearm in Gooch's vehicle, and ascertained through further investigation that Gooch was not permitted to carry a firearm, they certainly had probable cause to believe that Gooch was committing a crime. *See Brown*, 460 U.S. at 742; *accord United States v. McLevain*, 310 F.3d 434, 441(6th Cir. 2002). Therefore, police had authority to arrest Gooch. *See United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996) ("Police may arrest a person without a warrant if they have probable cause at the time of the arrest to believe that the person has committed or is committing a crime.") (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964) and *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1508 (6th Cir. 1988)). Nor were the police prohibited from searching Gooch's person or his vehicle once he was placed under arrest. *See Chimel v. California*, 395 U.S. 752, 72-763 (1969) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape."); *see also New York v. Belton*, 453 U.S. 454, 462-63 (1981) (holding that a search within the passenger compartment of a car in which the defendant had just been sitting was permissible as a search incident to arrest).

## III.

We hold that Gooch did not have a reasonable expectation of privacy in the location of his car, or those contents therein that were readily observable to passers-by. Therefore, the officers' observation of Gooch's pistol did not constitute a search within the meaning of the Fourth Amendment, so there was no constitutional violation. The district court's order denying Gooch's motion to suppress is **AFFIRMED**.