FILED
United States Court of Appeals
Tenth Circuit

January 10, 2012

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 10-3331

FELIPE RUIZ,

Defendant-Appellant.

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:10-CR-10032-MLB-1)**

Kurt P. Kerns of Ariagno, Kerns, Mank & White of Wichita, Kansas, for Defendant-Appellant.

David M. Lind, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with him on the brief), District of Kansas, Wichita, Kansas, for Plaintiff-Appellee.

Before **LUCERO**, **SEYMOUR**, and **EBEL**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Felipe Ruiz conditionally pled guilty to possessing with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1). He reserved his right to appeal the district court's denial of his motions to suppress evidence. On appeal, he contends the district court erred in refusing to suppress evidence seized from a rented airplane and from his former residence. We affirm.

**I.**

**A.**

On January 20, 2010, Mr. Ruiz flew a rented airplane from Las Cruces, New Mexico, and landed in Liberal, Kansas. The Air and Marine Operations Center (AMOC) is a radar monitoring and coordination facility affiliated with the Department of Homeland Security that monitors civilian air space for the purpose of detecting suspicious flights and criminal activity in private aviation. During Mr. Ruiz's flight, employees of AMOC concluded the flight was suspicious. They based this conclusion on their observations that Mr. Ruiz had not filed a flight plan in marginal weather, and the fact that an aircraft carrying drugs had landed in Liberal six months earlier. AMOC contacted an agent with Immigration and Customs Enforcement (ICE) to communicate these suspicions.

As Mr. Ruiz was landing, an ICE agent contacted Lyddon Aero Center, the fixed base operator at the airport in Liberal, and asked the receptionist, Megan

Parmenter, to report any suspicious behavior by Mr. Ruiz. When Mr. Ruiz came into the Lyddon Aero Center lobby, he paid Ms. Parmenter with cash for fuel and for storing the plane overnight in Lyddon's hangar.

It is not unusual for transient airplanes belonging to customers to be stored in Lyddon Aero Center's north hangar. Customers and employees have access to the north hangar during the day, but the facility is closed to customers at night. Mr. Ruiz's airplane was placed in the north hangar along with airplanes owned by other customers, as well as some owned by Bill Lyddon, one of Lyddon Aero Center's co-owners. Lyddon Aero Center is surrounded by a chain link fence and the north hangar is accessible through a coded gate or through the office.

After Mr. Ruiz left to stay in a local hotel, Ms. Parmenter spoke with the ICE agent, told him that Mr. Ruiz had paid in cash, and explained that it was unusual for customers to pay in cash. The ICE agent told Ms. Parmenter that there was a Kansas Bureau of Investigation (KBI) office in Liberal, and that he would send agents and a drug dog to Lyddon Aero Center. Ms. Parmenter subsequently called Mr. Lyddon to explain the situation. He instructed her to provide the officers and drug dog with access to the north hangar.

Shane Finely, a KBI special agent, went to Lyddon Aero Center and spoke with Ms. Parmenter. She told the agent that Mr. Ruiz paid in cash and that his airplane was in the north hangar. Mr. Finely asked to see the hangar, and Ms. Parmenter escorted him to it. After examining the airplane and finding it to be

locked, Mr. Finely contacted the sheriff's office in nearby Beaver County, Oklahoma, to request the assistance of a drug detection dog.

Sheriff Rueben Parker arrived soon thereafter with Kilo, his drug dog. At the time, Kilo was certified by the State of Oklahoma to detect heroin, cocaine, methamphetamine, and marijuana. Kilo was also certified by the National Narcotic Detector Dog Association located in San Marcos, Texas. When Kilo was deployed around the plane, he alerted several times to the presence of a narcotic in the plane. Mr. Finely obtained a search warrant and returned to the hangar. Mr. Lyddon provided a bucket of spare keys, one of which opened the door of the plane. Inside, Mr. Finely found a suitcase containing 28 bundles of kilo-sized packages of cocaine.

**B.**

Beginning in January 2008, Mr. Ruiz rented a house in Norwich, Connecticut from Richard Oraskovich. On February 5, 2010, Mr. Oraskovich received a letter from Mr. Ruiz, dated January 18 stating that as of January 31 he would no longer be renting the home because he had unexpectedly relocated to Phoenix, Arizona. In the letter, Mr. Ruiz told Mr. Oraskovich he could keep the down payment and furniture, but he requested that Mr. Oraskovich store his electronics, documents, and clothing until he could return. A few days later, Mr. Oraskovich received another letter that was essentially identical to the first one.

On the afternoon of February 5, Mr. Oraskovich's wife went to the rental house with a locksmith because Mr. Ruiz had changed the lock. The locksmith had to drill out the lock because it was tamper-proof. After finding several thousand dollars in the downstairs bathroom, Mrs. Oraskovich called her husband. When he arrived at the residence, Mr. Oraskovich found two wooden crates in the garage, clothes all over the bedroom, and flight plans and manuals in the study. Believing that something was wrong, he contacted the Norwich Police Department (NPD).

Several NPD officers responded, and Mr. Oraskovich asked them to search the residence. During their search, one of the officers noticed on a rafter in the basement ceiling what looked like kilo packages of drugs. One of them was partially open and contained a white powdery substance that appeared to be cocaine. The officers contacted NPD detectives, who acquired a search warrant. During the subsequent search they seized packages of cocaine, $8,700 in cash, money counters, computer equipment, and a safe. Sometime later, federal law enforcement officers obtained a second search warrant and performed an additional search of the residence.

## C.

Mr. Ruiz filed separate motions to suppress the evidence seized during the searches of the airplane and the rental house. After an evidentiary hearing, the

district court denied both motions.

## II.

Mr. Ruiz first contends the district court erred when it denied his motion to suppress the evidence obtained from the search of the airplane. In his motion, Mr. Ruiz relied on *Franks v. Delaware*, 438 U.S. 154 (1978), and argued the affidavit for search of the airplane recklessly omitted two types of material information that would have altered the probable cause determination. Mr. Ruiz asserted the affidavit omitted information that would have demonstrated his reasonable expectation of privacy in the north hangar. He also contended the affidavit omitted information that would have undermined the reliability of Kilo's positive alerts near the airplane.

Under *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978),

> [w]e exclude evidence discovered pursuant to a search warrant when (1) a defendant proves by a preponderance of the evidence "the affiant knowingly or recklessly included false statements in or omitted material information from an affidavit in support of a search warrant and (2) after excising such false statements and considering such material omissions we conclude the corrected affidavit does not support a finding of probable cause."

*United States v. Campbell*, 603 F.3d 1218, 1228 (10th Cir. 2010) (quoting *United States v. Garcia-Zambrano*, 530 F.3d 1249, 1254 (10th Cir. 2008) (alterations omitted); *see also United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997). "The standards of deliberate falsehood and reckless disregard set forth in

*Franks* apply to material omissions as well as affirmative falsehoods." *United States v. McKissick*, 204 F.3d 1282, 1297 (10th Cir. 2000). An omission is material if it is "so probative as to negate probable cause." *Stewart v. Donges*, 915 F.2d 572, 582 n.13 (10th Cir. 1990).

When we review a district court's denial of a motion to suppress, we review de novo the district court's ultimate determination of reasonableness under the Fourth Amendment, but we accept the district court's factual findings unless they are clearly erroneous and we view the evidence in the light most favorable to the prevailing party. *United States v. Avery*, 295 F.3d 1158, 1167 (10th Cir. 2002). "Specifically, we review for clear error the district court's findings regarding the truth or falsity of statements in the affidavit and regarding the intentional or reckless character of such falsehoods." *Garcia-Zambrano*, 530 F.3d at 1254. "Whether a corrected affidavit supports a finding of probable cause is a question of law that we review de novo." *Id.*

## A.

The district court found that Mr. Ruiz had no reasonable expectation of privacy in the north hangar. In making this finding, the court relied on *United States v. Porter*, 701 F.2d 1158, 1164-65 (6th Cir. 1983), where the Sixth Circuit held that a defendant had no expectation of privacy in an airplane hangar he did not control, even though he had permission to use it occasionally. The district

court emphasized that Lyddon Aero Center is open to the public during business hours; the north hangar is a community hangar used to store aircraft and equipment for Mr. Lyddon and his customers; Mr. Lyddon maintains control over the hangar and gave officers permission to enter it; and while employees and customers have access to the hangar during the day, customers do not have access after business hours. The court noted that while Mr. Ruiz had permission to store the airplane in the hangar, he presented no evidence establishing that he maintained control over the hangar.

A search only violates an individual's Fourth Amendment rights if he or she has a "legitimate expectation of privacy in the area searched." *United States v. Anderson*, 154 F.3d 1225, 1229 (10th Cir. 1998). In determining whether Mr. Ruiz had a legitimate expectation of privacy in the north hangar, we consider two factors: (1) "whether the defendant manifested a subjective expectation of privacy in the area searched" and (2) "whether society is prepared to recognize that expectation as objectively reasonable." *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000) (internal quotation marks omitted). We agree with the Sixth Circuit that a defendant has no objectively reasonable expectation of privacy in a hangar that he does not control. *Porter*, 701 F.2d at 1164-65. Here, Mr. Lyddon maintained control over the hangar at all times, the hangar stored aircraft and equipment for Mr. Lyddon and other customers, and Mr. Ruiz had no access to the hangar after business hours. Even if Mr. Ruiz had a "subjective expectation

of privacy" in the hangar, it was not an "objectively reasonable" one. *See Allen*, 235 F.3d at 489.

Mr. Ruiz correctly contends the affidavit omitted information concerning the security of the hangar that is arguably relevant to whether he had a legitimate expectation of privacy in it. Specifically, the affidavit did not state that Mr. Ruiz paid to store the airplane in the hangar, that the hangar itself was only accessible to Lyddon Aero Center employees or other customers, and that the facility was located on fenced property accessible only through a coded gate. Even if this information had been included, however, it is not "so probative as to negate probable cause," *Stewart*, 915 F.2d at 582 n.13, because it does not establish that Mr. Ruiz had a legitimate expectation of privacy in the hangar in the circumstances of this case.

Mr. Ruiz urges us to find he had a reasonable expectation of privacy in the hangar comparable to a tenant's expectation of privacy in his rented house or a motel occupant's expectation of privacy in his motel room. *See, e.g.*, *Stoner v. California*, 376 U.S. 483, 487-90 (1964) (holding that search of hotel room without a search warrant and without consent of absent guest was unlawful, even though hotel clerk had consented to search); *Chapman v. United States*, 365 U.S. 610, 615-18 (1961) (holding that police officers' warrantless search of rented home, with consent of landlord but not tenant, violated tenant's Fourth Amendment rights). But this case is quite different because Mr. Ruiz stored the

airplane in a hangar entirely controlled by Mr. Lyddon. And unlike the occupant of a rented home or motel room, Mr. Ruiz shared the hangar space with other Lyddon Aero Center customers. If anything, this case is more analogous to *Minnesota v. Olson*, 495 U.S. 91 (1990), where the Supreme Court held that "an overnight guest has a legitimate expectation of privacy in his host's home," but "[t]he host may admit or exclude from the house as he prefers." *Id.* at 98-99. Thus, even if we assume that Mr. Ruiz had an expectation of privacy in the hangar akin to that of a houseguest, Mr. Lyddon as the owner could nevertheless admit law enforcement officials into the hangar.

Finally, Mr. Ruiz cites two cases involving parking lots which, he claims, support his argument that he had a legitimate expectation of privacy in the hangar. In *United States v. Ludwig*, 10 F.3d 1523 (10th Cir. 1993), we held that a defendant had no reasonable expectation of privacy in a motel parking lot that "was open and visible from the public roads bordering it," where the defendant "produced no evidence that the lot was fenced, that a gate prevented unauthorized entry, or even that signs restricted entry to the parking lot." *Id.* at 1526. The parking lot was patrolled by law enforcement officers and drug dogs with permission from the motel manager. *Id.* at 1525. *Ludwig* is of no help to Mr. Ruiz. There, as here, police were present with the owner's permission. *Id.* The mere fact that the defendant in *Ludwig* lacked a legitimate expectation of privacy in an unfenced, open parking lot does not imply that Mr. Ruiz had a privacy

interest in a fenced hangar that he shared with the hangar's owner and other customers.

Similarly, in *United States v. Gooch*, 499 F.3d 596 (6th Cir. 2007), the Sixth Circuit held that a defendant did not have a reasonable expectation of privacy in a VIP section of a parking lot where the lot was shared by several commercial establishments, members of the public could freely walk through the VIP area, and police regularly patrolled the lot, including the VIP area. *Id*. at 601-02. In dicta, the court suggested that had the case "concerned a private parking garage that required individuals to use a code or card to enter," then "one could reasonably argue that the area was not open to the general public, and thus individuals might have a higher expectation of privacy." *Id*. at 601. But the Sixth Circuit's dicta does not explain whether occupants of a private parking lot would continue to maintain a "higher expectation of privacy" where the lot's owner authorized law enforcement officers to patrol the property. Neither our statements in *Ludwig*, nor the Sixth Circuit's dicta in *Gooch*, undermines our conclusion here that Mr. Ruiz did not have a reasonable expectation of privacy in the hangar where Mr. Lyddon maintained control over it at all times, Mr. Ruiz lost access entirely after business hours, Mr. Ruiz shared the space with other customers, and Mr. Lyddon allowed law enforcement officials to enter.

**B.**

The district court also found that the affidavit did not contain any false statements or material omissions regarding the drug dog, Kilo. The court found the affidavit sufficient because it accurately represented that Kilo was certified to detect heroin, cocaine, methamphetamine, and marijuana. The court further found the affidavit did not omit any material information concerning Kilo's reliability, and Mr. Ruiz presented no evidence that Kilo's alerts were unreliable. Mr. Ruiz contends testimony by Mr. Parker showed that on three of Kilo's past ten drug sniffs, the dog falsely alerted authorities even though no drugs were found. Had this information been included, Mr. Ruiz believes probable cause would have been vitiated.[1]

"As a general rule, a search warrant based on a narcotics canine alert will be sufficient on its face if the affidavit states that the dog is trained and certified to detect narcotics." *Kennedy*, 131 F.3d at 1376-77 (citations omitted). We do

---

[1] The search warrant affidavit described the narcotic dog's alert as follows:

> Sheriff PARKER deployed his certified K9 to sniff the exterior of the aircraft. The K9 indicated to the presence of a narcotic odor coming from the aircraft. Sheriff PARKER's K9 is certified to detect heroin, cocaine, methamphetamine and marijuana.

> Sheriff PARKER advised that his certified K9 alerted to the presence of a narcotic odor coming from the aircraft.

Aplt. App., vol. I at 20.

not require "affiants to include a complete history of a drug dog's reliability beyond the statement that the dog has been trained and certified to detect drugs." *Id.* at 1377.  Under *Franks*, a court may look beyond the affidavit to see whether it omitted material information about a particular dog's reliability that would negate probable cause.  *See id.*  This does not mean, however, that we must "mount a full-scale statistical inquisition" into the drug dog's history.  *United States v. Ludwig*, 641 F.3d 1243, 1251 (10th Cir. 2011).  "Instead, courts typically rely on the dog's certification as proof of its reliability," given that "canine professionals are better equipped than judges to say whether an individual dog is up to snuff."  *Id.*  Of course, "if a credentialing organization proved to be a sham, its certification would no longer serve as proof of reliability."  *Id.* (citations omitted).  In other words, the judicial task is limited "to assessing the reliability of the credentialing organization, not individual dogs."  *Id.*

In this case, Kilo was certified by the State of Oklahoma to detect heroin, cocaine, methamphetamine, and marijuana.  Kilo was also certified by the National Narcotic Detector Dog Association.  Mr. Ruiz has not argued that either of these credentialing organizations is a sham.

Even assuming Kilo had a reliability rate of seventy percent over his last ten drug sniffs, probable cause was not undermined.[2]  In *Ludwig*, where the

---

[2] We have previously noted that although "[a] false alert occurs when no seizable amounts of contraband are located during a search," false alerts do not

(continued...)

"dog's alert suggested a 58% chance of finding a seizable quantity of drugs," we explained that "[w]hile we hesitate to get into the business of affixing figures on probable cause, if we were pushed to do so we would hold this to be enough." *Id*. at 1252. "After all, probable cause doesn't require an officer's suspicion about the presence of contraband to be more likely true than false." *Id*. (citations and internal quotation marks omitted). Accordingly, omission of the information about Kilo's reliability was immaterial.

Because the information omitted from the affidavit was immaterial to the magistrate's probable cause determination, we need not determine whether the omissions were the result of "reckless disregard for the truth" or a "deliberate falsehood." *See Kennedy*, 131 F.3d at 1376. The district court properly denied Mr. Ruiz's motion to suppress the evidence obtained from the search of the airplane.

**III.**

The second issue in this appeal concerns the district court's denial of Mr. Ruiz's motion to suppress evidence seized from his former residence, including cocaine. In his motion to suppress and brief in support thereof, Mr. Ruiz asserted

[2](...continued)
necessarily mean "that the drug dog alerted without detecting any odor of narcotics." *Kennedy*, 131 F.3d at 1375 n.6. Drug dogs can detect narcotics residue that is left on objects that have come into contact with drugs, "even though no seizable quantity [of drugs] has been found." *Id.*

only that the police's initial entry of the rental house was unconstitutional because it was without his permission and without a warrant. He did not specifically contend that the search of his personal property was otherwise unconstitutional. Accordingly, the district court addressed only whether Mr. Ruiz retained a reasonable expectation of privacy in the rental house. The court found that when Mr. Ruiz terminated the lease he effectively abandoned the rental house. As a result, he did not have a reasonable expectation of privacy in the house at the time the police searched it upon request of the owner.

"[T]he Fourth Amendment allows for warrantless search and seizure of abandoned property." *United States v. Flynn*, 309 F.3d 736, 738 (10th Cir. 2002) (citing *United States v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1993)). "The test for abandonment is whether the defendant retained a reasonable expectation of privacy in the property." *Id.* (citing *Hernandez*, 7 F.3d at 947). "An expectation of privacy is a question of intent which may be inferred from words, acts, and other objective facts." *Hernandez*, 7 F.3d at 947 (citation omitted). The abandonment must also be voluntary. *Id.*

Mr. Ruiz's letter to Mr. Oraskovich explicitly stated that, as of January 31, 2010, he would no longer be renting the home. He also explained that because he was unable to return, the landlord could keep his furniture. In this case, there is no question that Mr. Ruiz voluntarily abandoned the rental house when he terminated the lease. *See United States v. Stevenson*, 396 F.3d 538, 547 (4th Cir.

2005) ("[W]hen someone no longer lives in his apartment, expresses an intention of not returning to his apartment, gives away all of his personal property in the apartment, and abandons his leasehold interest in the apartment, his subjective expectation of privacy in that apartment is not reasonable as a matter of law.").

Mr. Ruiz now argues that even if he abandoned the rental house, he retained a legitimate expectation of privacy in his personal belongings, including the black plastic bag and the packages of cocaine which, when discovered by the police, led state and federal officers to acquire search warrants to search the house and seize various items. Because Mr. Ruiz failed to raise this argument in the district court, we will not consider it. *See United States v. Burke*, 633 F.3d 984, 988 (10th Cir. 2011) ("[A] suppression argument raised for the first time on appeal is waived (i.e., completely barred) absent a showing of good cause for why it was not raised before the trial court.").

We thus hold the district court did not err in denying Mr. Ruiz's motion to suppress evidence found in the rental house. Reviewing de novo the ultimate question of reasonableness under the Fourth Amendment, we conclude the seizure of evidence in this case was valid.

We **AFFIRM**.