FILED
**United States Court of Appeals**
**Tenth Circuit**

**March 10, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.                                                                          No. 23-1240

JOSEPH GAYE,

    Defendant - Appellant.

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:21-CR-00015-WJM-1)**
_____

Jessica Stengel, Assistant Federal Public Defender (Scott Keith Wilson, Federal Public Defender, with her on the briefs) Office of the Federal Public Defender, Salt Lake City, Utah, for Defendant-Appellant.

Alexander E. Duncan, Assistant United States Attorney (Matthew T. Kirsch, Acting United States Attorney, with him on the brief) United States Attorney's Office, Denver, Colorado, for Plaintiff-Appellee.

_____

Before **TYMKOVICH**, **BALDOCK**, and **EID**, Circuit Judges.
_____

**TYMKOVICH**, Circuit Judge.
_____

Joseph Gaye was staying late at his office when he called 911, reporting that a man wearing a mask ran in, shot him, and ran out.  Officers and first responders arrived on scene soon after and found Mr. Gaye bleeding on the floor.  As Mr. Gaye

was rushed to the hospital, officers noticed a bullet casing on his desk, but no sign of any forced entry, struggle, or another person. They began to suspect that Mr. Gaye had shot himself and falsely reported that he was shot by an intruder.

The officers secured a search warrant specifying their suspicions that Mr. Gaye falsely reported a crime. Officers searched the office, and found a handgun in a locked drawer, with one bullet missing from the magazine. Meanwhile, surgeons removed the bullet from Mr. Gaye's leg. The bullet was later matched to the handgun found in Mr. Gaye's office.

Mr. Gaye, a felon, was indicted and convicted for being a felon in possession of a firearm. He seeks on appeal to suppress evidence produced by the search warrant, and to suppress the bullet removed from his leg. But because the warrant was specific and executed in good faith, and Mr. Gaye consented to the bullet's removal, thereby voluntarily relinquishing any privacy interest in it, we hold there was no violation of the Fourth Amendment.

We affirm the district court.

## I.    BACKGROUND

### A.    911 Call and First Response

Mr. Gaye called 911 from his office in distress. [R. Vol. VI at 0:28–0:32.] He told the dispatcher that he had just been shot by a man wearing a mask. Mr. Gaye could not tell the dispatcher anything about his assailant and claimed that the unknown man ran into the office, shot him, and ran out again. [*Id.* at 0:35–0:40; 2:30–2:41; 3:05–3:37.]

Denver Police officers responded first to the scene, but had to break into the office building because it was after-hours and the door was locked. [R. Vol. III at 265.] They found Mr. Gaye on the floor beside his desk, his pants soaked with blood. [*Id.*] The first officer to reach him observed a bullet entry wound on his inner thigh, and the officers applied a tourniquet to Mr. Gaye's leg. The entry wound was at a downward trajectory, having hit Mr. Gaye's groin and left thigh. [R. Vol. I at 48.] Paramedics arrived shortly after, and transported him to the hospital.

The officers confirmed no one else was in the building, but noticed no signs of forced entry, even though the building was locked when they had arrived. [R. Vol. I at 266–68.] There was no evidence that someone had shot into the office from outside, and they also noticed a shell casing on Mr. Gaye's desk. [*Id.* at 270.] The officers began to suspect that Mr. Gaye had shot himself. [*Id.* at 317.]

## B.    *The Search Warrant*

The officers prepared a search warrant and supporting affidavit. The warrant listed multiple categories of property sought, with varying breadth, including:

> Any Material evidence developed by a thorough crime scene investigation such as still and video photographing, measuring, other personal property of the victim, trace material of every kind such as clothing, fiber, hair, body fluids, and latent prints and objects on which they are found, documentary evidence tending to establish the motive or identity of any suspect or witness.

> Articles of personal property tending to establish the identity of the person(s) in control or possession of the items seized, such as utility company receipts, rent receipts, canceled mail envelopes, vehicle registration, credit card receipts, repair bills, photographs, keys and articles of clothing.

3

Any and All Firearms and Firearm components – including handguns, rifles, accessories, and/or simulated firearms.

Any and All Firearm Ammunition, - including live ammunition, expended projectiles, and/or expended shell-casing.

Laptop computer.

[R. Vol. I, at 45.]  The warrant also included a clause stating "[b]ased upon the affidavit of the above named affiant, which is incorporated by reference, I am satisfied that there is probable cause to believe that the property described is located at the place . . . above described." [*Id.*]

The affidavit repeated the same categories, but also recounted the 911 call, the unknown masked assailant, the police response, officers' observations about the bullet's trajectory, the lack of evidence of an intruder, and the spent shell casing on the desk.  [R. Vol. I at 46–48.]  It concluded that officers suspected Mr. Gaye had suffered a self-inflicted gunshot wound. [1]  [*Id.*]

The warrant and the affidavit were approved by a deputy district attorney and by a state judge who signed both documents.  [*Id.* at 45, 48.]  Police then searched the office, where they seized the bullet casing, Mr. Gaye's bloody clothes, and other personal items. [*Id.* at 50.]  In a locked desk drawer, officers found a loaded handgun, with a bullet chambered and one bullet missing from the magazine.  The handgun used the same 9mm caliber as the shell casing found on the desk and had an obliterated serial number.  [*Id.*]

---

[1] The affidavit stated "[b]ased on your Affiant's experience the injury GAYE suffered from may have been self-inflicted due to the trajectory of the wound."  R. Vol. I, at 48.

### C.    The Bullet

While the officers were conducting this investigation, Mr. Gaye was taken to Denver Medical Health Center by paramedics.  [*Id.* at 83 n.5.]  Surgeons removed the bullet from Mr. Gaye and placed it into an evidence bag.  The evidence bag was stored in a locked box, and later retrieved by a Denver Police crime lab technician.  [*Id.* at 83 n.6.]  It is standard procedure for the hospital to place extracted bullets or bullet fragments into evidence bags, which are then stored in the same locked box, accessible only by Denver Police.  Mr. Gaye was not warned that the bullet would be provided to law enforcement.

At no point did Mr. Gaye, who was in and out of consciousness, indicate that he wanted to keep the bullet, that the bullet was his, or that the hospital could not release the bullet to law enforcement.  As far as anyone at the hospital knew, the bullet came from an unknown assailant who had shot Mr. Gaye.

A crime lab technician later collected the evidence from the hospital lockbox, and matched the bullet taken from Mr. Gaye's leg to the handgun found in his desk.

## II.    PROCEDURAL HISTORY

Mr. Gaye was indicted in the District of Colorado on one count of possession of a firearm as a felon, and later stipulated to his prior felony conviction.  [R. Vol. I at 9–10, 150].

He moved to suppress the bullet and any evidence produced by the search warrant.  [*Id.* at 28–30.]  The district court declined to suppress the evidence, finding that the affidavit adequately supported a search for evidence of the crime of false reporting.  It

also held in the alternative that the good faith doctrine applied, so an overbroad warrant would not have required suppression.

Mr. Gaye was later convicted by a jury and sentenced to 44 months' imprisonment. His timely appeal seeks to have his conviction vacated because he believes the suppression ruling should be overturned.

### III.    ANALYSIS

Mr. Gaye moved to exclude the evidence found in his office and the bullet removed from his leg, arguing they were obtained in violation of the Fourth Amendment. He contends his office was searched without a sufficiently specific warrant, and that the bullet was seized without a warrant or reasonable suspicion.

Because the district court denied his motion to suppress, "we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment." *United States v. Cotto*, 995 F.3d 786, 795 (10th Cir. 2021).

We also review de novo the applicability of exceptions to the exclusionary rule, such as the good-faith exception. *United States v. Knox*, 883 F.3d 1262, 1268 (10th Cir. 2018).

### A.    *The Search Warrant and Good Faith*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Out of respect for that right, the Fourth Amendment

typically requires a search or seizure to be supported by a warrant. And "[n]o warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." *Id.* If evidence is obtained by violating these commands, a defendant may move for suppression of any evidence that resulted from the unconstitutional search. *Davis v. United States*, 564 U.S. 229, 236 (2011).

To prevent warrants that are too general, a warrant must "describe the items to be seized with as much specificity as the government's knowledge and circumstances allow." *United States v. Sells*, 463 F.3d 1148, 1154 (10th Cir. 2006) (quoting *United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988)). A warrant must give law enforcement guidance on how to "distinguish between items that may and may not be seized." *Leary*, 846 F.2d at 602.

But even where a warrant is overbroad, evidence should be suppressed only as "a last resort, not a first impulse." *Sells*, 463 F.3d at 1154 (internal quotation marks omitted). "When possible, we apply the doctrine of severance to save an overbroad warrant." *Cotto*, 995 F.3d at 798–99. Under this doctrine "valid portions of a warrant are severed from the invalid portions and only materials seized under the authority of the valid portions, or lawfully seized while executing the valid portions, are admissible." *Id.* (quoting *Sells*, 463 F.3d at 1154). "Practically, where each of the categories of items to be seized describes distinct subject matter in language not linked to language of other categories, and each valid category retains its significance

when isolated from [the] rest of the warrant, then the valid portions may be severed from the warrant." *Id*. (internal quotation marks omitted).

Nor will evidence be suppressed if "a law enforcement officer relies in objective good faith on a warrant issued by a detached and neutral magistrate." *Knox*, 883 F.3d at 1273 (citing *United States v. Leon*, 468 U.S. 897, 922, (1984)). "[W]e generally presume officers executed a search warrant in objective good faith." *United States v. Campbell*, 603 F.3d 1218, 1230 (10th Cir. 2010). This presumption disappears when the text of an affidavit supporting a warrant "is so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923. But "it is indicative of good faith when the officer who prepares an affidavit is the same one who executes a search." *Cotto*, 995 F.3d at 795.

### 1. The Search Warrant

The search warrant for Mr. Gaye's office and the accompanying affidavit do not offend the Fourth Amendment.

As recounted above, while the warrant contained some categories of evidence that were broad, it also contained some that were narrow. Sometimes, a broad warrant leaves officers with "unbridled discretion to conduct an exploratory rummaging through [the defendant's property] in search of criminal evidence." *Cotto*, 995 F.3d at 798 (alterations in original) (quoting *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d 137, 149 (3d Cir. 2002)). But here, even if some provisions of the warrant are broad, the

8

affidavit sufficiently narrows it. The affidavit included details of Mr. Gaye's 911 call, the observations made by officers on the scene, and the suspicious inconsistencies between the two.

Mr. Gaye contends the warrant does not identify a specific crime. But our cases allow a warrant as long as "the warrant and its accompanying affidavit adequately describe[ ] the criminal activity under investigation." *United States v. Le*, 173 F.3d 1258, 1274 (10th Cir. 1999). The affidavit here contains enough information to describe two crimes in the alternative. The affidavit included the specifics of Mr. Gaye's 911 call, along with multiple observations that deviated from his report, and the conclusion, "based on your Affiant's experience the injury GAYE suffered from may have been self-inflicted due to the trajectory of the wound." R. Vol. I at 48 (capitals in original). In other words, the affidavit articulated a reported shooting, and that the officers suspected Mr. Gaye had falsely reported it. Whether Mr. Gaye was telling the truth or lying, officers would know to look for evidence that corroborated or discredited his story.[2] That "description of suspected criminal activity is specific enough to give the executing officers adequate guidance, when searching the business, to be able to 'distinguish between items that may and may not

---

[2] Neither party raises the originally reported criminal activity—the unknown man's shooting of Mr. Gaye—as the criminal activity justifying a search warrant. But it seems obvious that the warrant identified an aggravated assault with enough particularity for officers to search for relevant evidence, including evidence that might show the crime had *not* occurred. In fact, the warrant, affidavit, and the inventory form listing items collected from the search were labeled "Aggravated Assault – Shooting" in the header. R. Vol. I at 45–50.

be seized.'" *Le*, 173 F.3d at 1275 (quoting *Leary*, 846 F.2d at 602).  The government

points out at oral argument, for example, that it could not have seized all business

documents from Mr. Gaye's office.

Mr. Gaye argues that the warrant should be viewed in isolation from the

affidavit because the affidavit was not "attached" to the warrant.  But putting aside

the failure to preserve this argument below, this position on appeal conflicts with the

position he took in the district court.  He conceded in the district court that the

affidavit was incorporated by reference in the warrant and made arguments that the

warrant should be construed by reference to the affidavit.  Although there is a

distinction between incorporation and attachment,[3] any error in relying on the

affidavit was still an invited error.  *United States v. McBride*, 94 F.4th 1036, 1041

(10th Cir. 2024).  And an "invited error precludes a party from arguing against a

proposition the party willingly adopted."  *United States v. Rodebaugh*, 798 F.3d

1281, 1304 (10h Cir. 2015).

### 2.  *Good Faith*

The government also argues that the warrant was executed in good faith.  We

generally presume that officers act in good faith when executing a warrant.

*Campbell*, 603 F.3d at 1230.  And all indicia of good faith are present here.  The

---

[3] Mr. Gaye tries to harmonize his position in the lower court (that the affidavit was incorporated) with his position on appeal (that the affidavit was not attached), by arguing that the attachment argument was merely forfeited.  But forfeited arguments are reviewed for plain error.  And it was not plain error for the district judge to conclude that the affidavit was attached to the warrant when the judge signed both documents in tandem.

warrant was first presented to a district attorney, who approved it, and then sent to a neutral judge, who signed it. The affidavit and search warrant were prepared by the same officer who executed the search. In *United States v. Cotto*, when confronted with an allegedly overbroad warrant, we held that the exact same indicia—preparation and execution by the same officer, and approval by a district attorney and a state judge—was enough to conclude that officers acted in good faith. 995 F.3d at 797. An officer who prepares both a warrant and a narrower affidavit is more likely to stick to the narrow limitations in good faith, particularly where those limitations are approved by a neutral superior. *United States v. Russian*, 848 F.3d 1239, 1246–47 (10th Cir. 2017).

Mr. Gaye argues that the good-faith exception cannot apply here, where the Fourth Amendment clearly articulates the need for particularity. But this case is not like those where we have found a warrant to be "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923. Good faith requires only that the officers "created at least a minimally sufficient nexus" between the criminal activity and the place to be searched. *Id.* The nexus here is, of course, that the officers believed that Mr. Gaye had falsely reported a crime, and whatever actually happened occurred in his locked office.

The district court did not err in declining to suppress evidence found in Mr. Gaye's office.

11

**B.    *Seizing the Bullet***

We next consider the suppression of the bullet taken from Mr. Gaye's leg. After Mr. Gaye was found in his office, paramedics took him to the hospital, where surgeons removed the bullet, and later transferred it to police investigators. The bullet was matched to the handgun found in Mr. Gaye's office and was presented at trial as evidence against him. Although no one sought or a received a warrant for the bullet, it was properly seized, and Mr. Gaye has not shown a privacy interest in the bullet sufficient to invoke the Fourth Amendment.

"[T]he Fourth Amendment protects people—and not simply 'areas'—against unreasonable searches and seizures." *Katz v. United States*, 389 U.S. 346, 353 (1967). Under *Katz*, "what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* at 351–52. That expectation of privacy cannot be violated without a warrant, so long as it is an expectation "that society is prepared to recognize as reasonable." *United States v. Carpenter*, 585 U.S. 296, 304 (2018). So those seeking to invoke the Fourth Amendment to suppress the results of a warrantless seizure must show that their subjective expectation of privacy would be accepted by the public as objectively reasonable.

Since *Katz*, this test has functioned as an ostensible bedrock for Fourth Amendment doctrine. But it is a porous one—there is a plethora of exceptions to the *Katz* framework. The "intricate body of law regarding 'reasonable expectation of privacy' has been developed largely as a means of creating these exceptions, enabling

a search to be denominated not a Fourth Amendment 'search' and therefore not subject to the general warrant requirement." *California v. Acevedo*, 500 U.S. 565, 582 (1991) (Scalia, J., concurring).

*Katz* does not cover, for example, searches and seizures conducted with consent. *United States v. Gay*, 774 F.2d 368, 376 (10th Cir. 1985). Nor property in plain view when accompanied by probable cause. *Mincey v. Arizona*, 437 U.S. 385, 393 (1978); *Soldal v. Cook Cnty., Ill.,* 506 U.S. 56, 69 (1992). Nor abandoned or relinquished property. *See United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997); *United States v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1993). Nor property in a third party's possession. *See Carpenter*, 585 U.S. at 304. The list goes on. *Acevedo*, 500 U.S. at 582 (J. Scalia, concurring) ("In 1985, one commentator cataloged nearly 20 such exceptions." (citing Craig Bradley, *Two Models of the Fourth Amendment*, 83 MICH. L. REV. 1468, 1473–1474 (1985))).

The parties have vastly different views on the proper legal framework of this case. Mr. Gaye equates the bullet—taken from his body—with sensitive, personal information, or bodily material, such as urine or blood, which is private and not disclosable to law enforcement in the medical context. *See Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001) (a "typical patient undergoing diagnostic tests" enjoys a "reasonable expectation of privacy" in the "results of those tests."). But the government characterizes the bullet— once removed with consent—as relinquished property in plain view of officials with "probable cause to associate the property with criminal activity." *Soldal,* 506 U.S. at 69.

The government's view is more convincing. To understand why, two concessions are key. First, the government concedes that the staff at the hospital were government actors. Gov. Br. at 30. The district court concluded that the hospital staff were not government officials, but as discussed below, it did so without the benefit of full briefing. The government concedes for this case that the hospital staff acted on behalf of or in coordination with law enforcement when they removed the bullet and bagged it as evidence. Second, Mr. Gaye concedes that he consented to treatment and removal of the bullet. Op. Br. at 59–60. He admits that his 911 call and request for aid was consent to the surgical removal of the bullet.

So the precise dispute is over what rights or interests Mr. Gaye had in the bullet once it was removed from his leg. While on the phone with the 911 operator, he had requested emergency medical assistance, and never limited or conditioned that request. True, he was never told that the bullet would be given to law enforcement investigators, but neither did he ever claim an ownership or privacy interest in the bullet.

Multiple *Katz* exceptions apply here. Mr. Gaye's consent to have the bullet removed covers its surgical extraction from his body. He cannot—and does not—object to that intrusion on Fourth Amendment grounds. "A search and seizure, of course, may be made without a warrant or probable cause if the suspect voluntarily consents." *Gay*, 774 F.2d at 376. Mr. Gaye attempts to limit his consent only to the bullet's removal, not its seizure by law enforcement. But seizure occurs "when there is some meaningful interference with an individual's possessory interests in that

14

property." *Soldal*, 506 U.S. at 61. In other words, the bullet must have been seized the moment that hospital staff (stipulated public officials) took the bullet from Mr. Gaye's leg. That seizure cannot be disaggregated from the transfer to police. *See Ferguson*, 532 U.S. at 76 n.9 (collecting cases). Because he had consented to the bullet's seizure by government officials, Mr. Gaye had no continuing interest to prevent their transferring custody of the bullet to law enforcement.

Mr. Gaye also abandoned any privacy interest in the bullet after its removal by reporting that he had been shot. *See Hernandez*, 7 F.3d at 947. As far as anyone at the hospital knew, the bullet was evidence of a shooting, and Mr. Gaye had no claim to it. We have repeatedly held that a person who falsely disclaims ownership of a space or item cannot later assert a Fourth Amendment interest to satisfy suppression. *See, e.g. id.*; *United States v. Lowe*, 117 F.4th 1253, 1265 n.7 (10th Cir. 2024); *United States v. Easley*, 911 F.3d 1074, 1083 (10th Cir. 2018); *United States v. Ruiz*, 664 F.3d 833, 841–42 (10th Cir. 2012); *United States v. Hansen*, 652 F.2d 1374, 1384 n.8 (10th Cir. 1981) (all denying suppression where defendant disclaimed ownership or interest to officials). Mr. Gaye's story to first responders that a masked intruder fired the bullet abandoned his own interest in the bullet, dooming his argument that a warrant was necessary to seize the bullet once it was removed. "A warrantless search and seizure of abandoned property is not unreasonable under the Fourth Amendment." *Hernandez*, 7 F.3d at 947.

Considering the circumstances, the bullet was also seized properly under the plain view exception. *See Mincey v. Arizona*, 437 U.S. 385, 393 (1978). Where

15

"there is probable cause to associate the property with criminal activity" that is "immediately apparent," property in plain view may be seized reasonably, without a warrant. *Soldal*, 506 U.S. at 68–69. The bullet, once removed with consent, was in plain view of officials, and it was immediately apparent that there was probable cause to associate the bullet with the crime—either the shooting or false reporting, as discussed above. *See Horton v. California*, 496 U.S. 128, 135 (1990) ("Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement," such as consent, "the seizure is also legitimate."). This exception tracks the Fourth Amendment's general logic, that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, 289 U.S. at 251.

Consent, abandonment, plain view—any one of these exceptions alone would be enough to validate the search. Together, they are overwhelming. *See Lowe*, 117 F.4th at 1265; *Hernandez*, 7 F.3d at 947.

Mr. Gaye's counterargument is vastly expanded from his assertions in the district court. In one paragraph in his motion below, followed by one page in his reply brief, Mr. Gaye briefly argued that the court should adopt the holding of the Fifth Circuit in *United States v. Neely*, 345 F.3d 366 (5th Cir. 2003), to suppress the bullet. He does not mention *Neely* on appeal, and now argues instead that, like the results of a medical test, he had a privacy interest in the bullet which he never waived, and that the bullet was seized without a warrant. *Ferguson*, 532 U.S. at 78

16

("The reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent.").

To the degree this argument on appeal is merely an expansion of the unelucidated argument in the district court, it is unpersuasive: this case is distinguishable from *Ferguson*. That case involved indiscriminate (and involuntary) testing of otherwise routine urine samples from unsuspecting patients seeking medical attention. *Id.* at 76. That is not the same as a bullet which is already suspected to be evidence of a crime, removed with consent.[4] Furthermore, *Ferguson* already rejected Mr. Gaye's argument that he could consent to the bullet's removal, but not its transfer to law enforcement. In that case, the court refused to "disaggregate the taking and testing of the urine sample from the reporting of the results to the police." *Id.* at 76 n.9. That is unsurprising, as the seizure of the bullet, once it was removed from Mr. Gaye's body, no longer implicated "dignitary interests

---

[4] It is true the third-party disclosure doctrine does not apply to information divulged for medical treatment. *Lankford v. City of Hobart,* 73 F.3d 283 (1996). And whether the bullet, which presumably contained samples of Mr. Gaye's blood and DNA, was a medical record, or private medical information is an open question. But because the hospital staff are stipulated government actors, this analysis does not rely on the third-party disclosure rule, which involves initial disclosure only to *private* third parties. *See generally, Carpenter*, 585 U.S. at 305–08.

17

in personal privacy and bodily integrity." *Winston v. Lee*, 470 U.S. 753, 761 (1985). It was contraband evidence of a crime.[5]

***

Because the warrant was particularized, and the bullet was reasonably seized, the evidence used against Mr. Gaye was not subject to the exclusionary rule, and the suppression was properly denied.

## IV.    CONCLUSION

For the reasons stated above, the denial of the motion to suppress is

**AFFIRMED.**

---

[5] Nor does this case present overbreadth problems. We do not imply that anyone seeking emergency medical aid consents without limitation to searches by law enforcement. Mr. Gaye called 911 reporting that he had been shot by an unknown assailant. His call by default imputed incriminating value to the bullet. Not every 911 call gives rise to such criminal suspicion.