**UNITED STATES COURT OF APPEALS**

**April 24, 2018**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

THOMAS FORSTER GEHRMANN,
JR.; ERIC WILLIAM CARLSON,

Defendants - Appellees.

No. 16-1208
(D.C. Nos. 1:15-CR-00303-RBJ-1 and
1:15-CR-00303-RBJ-2)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **HOLMES**, **MURPHY**, and **PHILLIPS**, Circuit Judges.

During a criminal investigation into two chiropractors, Thomas F.

Gehrmann, Jr. and Eric William Carlson (collectively, "Defendants"), the

government obtained warrants to search Defendants' businesses and associated

storage facility for evidence supporting allegations of criminal tax offenses and

healthcare fraud. In support of the warrants, a federal agent furnished a forty-three

page probable-cause affidavit; it outlined the government's existing evidence,

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

described certain aspects of independent investigations that had been conducted by other entities, including a state regulatory body, and concluded with the agent's opinion that probable cause existed to believe that Defendants committed various criminal tax and healthcare-fraud offenses and that evidence of those offenses would be found at certain identified locations. A few months earlier, the Colorado Department of Regulatory Agencies ("DORA") had investigated similar allegations of healthcare fraud against Dr. Carlson, and had ultimately issued an admonition letter ("Admonition Letter") that made no mention of the healthcare-fraud allegations. Rather, DORA's Admonition Letter noted Dr. Carlson's failure to "make essential entries on patient records," but declined, largely without explanation, to pursue any "formal action." In crafting the probable-cause affidavit, the agent mentioned DORA's underlying investigation into allegations of healthcare fraud, but omitted any reference to DORA's Admonition Letter.

During the warrants' execution, federal agents and investigators seized responsive materials, and a federal grand jury subsequently charged Defendants with seven separate criminal tax offenses but, notably, no healthcare-fraud offenses. In advance of trial, Defendants moved to suppress the seized evidence and requested a *Franks* hearing,[1] arguing that the federal agent intentionally or recklessly omitted from his affidavit DORA's Admonition Letter and that the

---

[1] *See Franks v. Delaware*, 438 U.S. 154 (1978).

2

warrant would not have issued if that correspondence had appropriately been included.

The government opposed suppression. Following a *Franks* hearing, the district court found DORA's Admonition Letter material to the probable-cause determination for the suspected healthcare offenses but not the tax offenses. It further concluded that the invalid healthcare portions of the warrants were not severable from the valid tax portions, and suppressed *all* evidence seized under the warrants. The government filed this interlocutory appeal from this suppression ruling, attacking the district court's materiality and severability determinations, but not the court's antecedent conclusion that the agent intentionally or recklessly omitted DORA's Admonition Letter.

Exercising jurisdiction over this appeal pursuant to 18 U.S.C. § 3731, we **reverse** the district court's suppression order on materiality grounds, and **remand** for further proceedings.

## I

Drs. Gehrmann and Carlson, along with a nonparty John Davis ("Dr. Davis"), owned and operated Atlas Chiropractic Center at Briargate, Inc. ("Atlas") and SpineMed Decompression Centers of Colorado, LLC ("SpineMed")—two adjacent chiropractic businesses with separate storefronts, but shared internal office space, employees, bank accounts, and other resources.

In December 2007, a former patient of Dr. Carlson called United

3

Healthcare's ("United") fraud hotline to report Dr. Carlson for overbilling, among other allegedly improper practices. United's special investigative unit, Ingenix, initiated an investigation into Dr. Carlson, Atlas, and SpineMed, ultimately identifying a number of alleged billing improprieties—namely, requiring up-front payment for covered services and submitting duplicate or triplicate billings for certain services. In the end, "Ingenix's analysis disclosed" that Dr. Carlson, Atlas, and SpineMed received "a total of $460,338.10" due to various billing "misrepresentations." Aplt.'s App., Vol. I, at 64 (Rutkowski Aff., dated Sept. 16, 2011).

Ingenix referred these investigative findings to DORA, which opened an investigation and retained Dr. Ben Elder as an investigator. In that capacity, Dr. Elder reviewed eleven patient files and authored a comprehensive report detailing his concerns about Dr. Carlson's failure to maintain adequate patient records, and the evidence that "Dr. Carlson potentially misdiagnosed patients." *Id.* at 275 (Elder Report, dated Apr. 27, 2009). As for allegations of double billing by Dr. Carlson, Dr. Elder explained that the ostensible scheme "involved the patient paying cash to Dr. Carlson, as well as him receiving insurance reimbursement . . . for the same services," without redistributing the "alleged insurance payments . . . to the patients." *Id.* Given "the limited documentation concerning [Dr. Carlson's financial transactions]," however, Dr. Elder found that "this aspect of the case could not be concluded." *Id.* at 276. Nonetheless, Dr. Elder expressed his belief

4

that, given the "great deal of essential documentation that was missing from every file reviewed in th[e] case[,]. . . . Dr. Carlson and/or his attorney were intentionally trying to defraud [DORA]." *Id.* at 275. He suggested that Dr. Carlson's "absolute[]" failure to maintain financial records "warrant[ed] possible consultation with the Internal Revenue Service," *id.* at 276. Indeed, Dr. Elder encouraged DORA to "pass [his findings] along to the appropriate authorities." *Id.*

DORA subsequently provided Investigator Galeassi, a Senior Investigator with the Department of Labor ("DOL"), several documents regarding DORA's investigation into Dr. Carlson, including Dr. Elder's report. Upon receipt, Investigator Galeassi forwarded the materials to the U.S. Attorney's Office. *See* Aplt.'s App., Vol. I, at 144–45 (Letter from Investigator Galeassi to an Assistant U.S. Attorney, dated May 14, 2009). Agent Rutkowski, a Special Agent with the Internal Revenue Service ("IRS") Criminal Investigation Unit, appears to have received the DORA investigative documents in the fall of 2010. After that, the DOL and the IRS proceeded with a joint investigation into Dr. Carlson—and, ultimately also Dr. Gehrmann, Atlas, SpineMed, and non-party Dr. Davis—with Investigator Galeassi focusing on the healthcare-fraud aspect of the investigation, while Agent Rutkowski focused on the tax-fraud dimension.

On March 23, 2011, DORA issued an Admonition Letter to Dr. Carlson. *Id.* at 147 (Letter of Admonition, dated Mar. 23, 2011). DORA indicated that it was doing so in lieu of initiating a "formal action" against Dr. Carlson. *Id.* In the

5

single-page letter, DORA found that Dr. Carlson violated DORA regulations, by failing to "make essential entries on patient records including family and social history and appropriate intake examination information." *Id.* Pointing only to issues with patient documentation—and, importantly, without mentioning the healthcare-fraud allegations that gave rise to the investigation—DORA "admonishe[d] [Dr. Carlson] and warn[ed] [him] that repetition of such conduct [might] lead to imposition of more severe disciplinary sanctions." *Id.* Finally, DORA described the Admonition Letter as "a full and final resolution of the issues raised" in DORA's investigation—but not "any other cases, complaints, or matters"—and stated that, "[p]ursuant to an agreement with [DORA]," Dr. Carlson had "agreed to waive the right . . . to contest th[e] Letter of Admonition through a formal disciplinary proceeding and appeal." *Id.*

Shortly thereafter, on September 16, 2011, Agent Rutkowski executed a forty-three page probable-cause affidavit as part of a search-warrant application for Atlas's and SpineMed's office. At the outset of the affidavit, Agent Rutkowski detailed the outstanding investigation into Drs. Carlson and Gehrmann, and their affiliated businesses, Atlas and SpineMed, for possible violations of the following criminal statutes: (1) 26 U.S.C. § 7201 (Attempt to Evade or Defeat Tax); (2) 26 U.S.C. § 7206(1) (Filing False Income Tax Returns Under Penalties of Perjury); (3) 18 U.S.C. § 371 (Conspiracy); (4) 18 U.S.C. § 1035 (False Statements Related to Health Care Matters); (5) 18 U.S.C. § 1341 (Mail Fraud (Frauds and Swindles));

6

(6) 18 U.S.C. § 1343 (Wire Fraud); (7) 18 U.S.C. § 1347 (Health Care Fraud); and

(8) 18 U.S.C. § 2 (Aiding and Abetting).[2]

As the basis for these alleged violations, Agent Rutkowski traced the investigation from its beginning, starting with the initial "patient complaint regarding double billing," Aplt.'s App., Vol. I, at 63, Ingenix's investigation and finding, *see id.* at 64, and the subsequent referral of Ingenix's "investigative findings" to DORA, *id.* at 65. Turning then to the results of the investigative subpoenas, Agent Rutkowski stated that a review of Defendants' financial documents—specifically, their personal bank accounts, personal tax returns, and corporate tax returns—revealed that Defendants took part "in a conspiracy to divert corporate receipts from medical patients into their various personal bank accounts, for the purpose of Tax Evasion." *Id.* Agent Rutkowski explained that:

> A review of the deposited checks indicate[d] [that] patients [were] given instructions to make the checks payable to a specific doctor. On some of the checks, the patient started to make the check payable to the business, but then crossed out the name of the

---

[2] In separate attachments, Agent Rutkowski listed the locations to be searched, Atlas and SpineMed, and described the items to be seized—a wide array of financial, business, and patient records. The thirty-one point description of items to be seized included some items seemingly relevant only to tax fraud, others that appeared to relate solely to healthcare fraud, and then some categories of information that were arguably relevant to both offenses. During the *Franks* hearing, Agent Rutkowski expressed his opinion on how to characterize certain categories of seized items. Nonetheless, because we resolve this appeal on materiality grounds, we need not—and thus do not—determine the appropriate characterization of each category of seized evidence, as we would if we were obliged to conduct a severability analysis.

business and made the check payable to the doctor. It also appears that someone made a designation on the top portion of many of the checks, writing the letter "C", "D", or "G" along with other miscellaneous alpha characters.

*Id.* at 66. Marrying these checks to the bank account statements of Atlas, SpineMed, and Defendants, Agent Rutkowski classified "the money being deposited into the various personal bank accounts . . . as a 'corporate diversion'" because Atlas and SpineMed "never recorded [the checks] in the books" and Defendants did "not report[]" them "on their individual tax returns." *Id.*; *see also id.* at 69 (estimating the amounts of diverted funds). Against that backdrop, Agent Rutkowski claimed probable cause to believe that Defendants committed various criminal tax-fraud offenses, and that evidence of these offenses would likely be uncovered at the offices of Atlas and SpineMed.

Under a separate heading titled "**Federal Health Care Benefit Programs: Employee Benefit Plans**," Agent Rutkowski offered further information regarding DORA's investigation.[3] *Id.* at 70. Focusing on the allegations of healthcare fraud, Agent Rutkowski recounted United's investigation, through Ingenix, and Dr. Elder's report (discussing it in considerable detail over several pages). Agent Rutkowski ultimately relied on the findings of both investigations (i.e., of Ingenix

---

[3] Although not apparent from the face of the affidavit, Investigator Galeassi drafted the healthcare-related allegations, and provided them to Agent Rutkowski for incorporation into a single affidavit concerning both sets of alleged offenses (i.e., tax and healthcare).

and Dr. Elder) in averring that Dr. Carlson exhibited a "pattern of misrepresenting the actual services [he] provided" in connection with insurance reimbursement, *id.* at 77. Importantly, however, Agent Rutkowski made no mention of the "full and final resolution" embodied in DORA's Admonition Letter—"a disciplinary action" that DORA took nearly six months before Agent Rutkowski executed his affidavit. *Id.* at 147. Nonetheless, as in the tax-offenses portion of the affidavit, Agent Rutkowski stated his view that there was probable cause to believe that the offices of Atlas and SpineMed contained evidence of the specified healthcare offenses.

A magistrate judge issued the search and seizure warrant on the same day, and Agent Rutkowski (along with other agents from the IRS and the DOL) executed the warrant on September 22, 2011, seizing patient files, business records, and the like. During the search, the agents learned of a separate storage unit, containing additional business records. Relying on the same underlying affidavit (including its attachments), Agent Rutkowski obtained an additional warrant to search the storage unit and, there, seized responsive materials.

On July 22, 2015, a federal grand jury returned a seven-count indictment, charging Drs. Carlson and Gehrmann each with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and three counts each of filing false tax returns, in violation of 26 U.S.C. § 7206(1). Notably, the indictment did not charge the Defendants with healthcare-fraud offenses.

Following the indictment, Defendants moved "to suppress [any and all]

9

evidence recovered pursuant to the search of their place of business and related storage unit," *id.* at 33 (Defs.' Mot. to Suppress Evid., filed Nov. 9, 2015), on the theory, as relevant here, that Agent Rutkowski premised his probable-cause affidavit principally "upon the DORA allegations and investigation," *id.* at 52; *see also id.* at 41–43, but "[a]t no time . . . . explain[ed] that ultimately the DORA matter resolved with findings that most of the initial accusations were unfounded," *id.* at 51–52. Pressing this position, Defendants argued that Agent Rutkowski's "fail[ure] to provide a full, fair and frank picture" of DORA's investigation cast doubt on the overall veracity of his affidavit, *id.* at 52, requiring a *Franks* hearing and ultimately the suppression of all evidence "obtained pursuant to the warrants issued based on th[e] affidavit," *id.* at 53; *see also id.* at 176–96 (Defs.' Reply to Mot. to Suppress Evid., filed Jan. 29, 2016) (restating Defendants' position on the materiality of the DORA letter, and asserting that the affidavit failed to establish probable cause for any tax or healthcare offenses). Opposing Defendants' motion, the government countered, in relevant part,[4] that Agent Rutkowski "accurately recounted the genesis of the DORA proceeding as to defendant [Dr.] Carlson and

---

[4]    Aside from contesting the merits of Defendants' suppression motion, the government challenged Defendants' "standing" to contest the warrants, asserting that Defendants lacked a reasonable expectation of privacy in the searched commercial premises. Aplt.'s App., Vol. I, at 155–59. The district court rejected the government's position, and the government mounts no challenge to this determination on appeal. Thus, we deem any such argument to be abandoned and, thus, waived here.

10

Atlas," *id.* at 172 (Gov't's Opp'n, filed Nov. 20, 2015), and asserted that Agent Rutkowski's "innocent" omission of DORA's Admonition Letter was immaterial to the magistrate judge's probable-cause determination, *id.* at 173–74. In any event, the government reasoned that DORA's Admonition Letter would have "no relevance" to the probable-cause showing regarding the alleged tax violations. *Id.* at 173.

The district court decided that Defendants had made a sufficient showing to warrant a *Franks* hearing and conducted it on April 13, 2016. The court received testimony from Agent Rutkowski concerning the preparation of his probable-cause affidavit, along with follow-up legal argument. Briefly recounted, Agent Rutkowski testified that he knew of and had reviewed DORA's Admonition Letter during his preparation of the affidavit, and acknowledged that, though he "included the underlying documents that went along with [DORA's] investigation," he elected not to include the resulting Admonition Letter. *Id.*, Vol. II, at 319 (*Franks* Hr'g Tr., dated Apr. 13, 2016).

Nonetheless, Agent Rutkowski attempted to explain away his omission of the Admonition Letter on the following grounds: *first*, he viewed the correspondence as a "settlement letter" or "letter of punishment" with "no bearing on any criminal investigation," *id.*; *accord id.* at 332; *second*, he emphasized that Investigator Galeassi acted as "the primary input mechanism" for the healthcare-related (and thus, presumably, DORA-related) allegations, *id.* at 319–20; and *finally*, he stated

11

that the admonition letter was "ultra vague," in that "[i]t [didn't] tell [him] much about the investigation, the character of it, [or] what happened," *id.* at 335.  Rather, he viewed the underlying materials as the "original" and "best" method of "present[ing] [the magistrate judge] with the facts and circumstances behind the investigation."  *Id.* at 337.

On April 25, 2016, the district court granted Defendants' suppression motion, making two findings relevant to our disposition.  First, the district court concluded that "Agent Rutkowski misrepresented the health care fraud allegations as though they had not yet been resolved and omitted the Admonition Letter with the intent to mislead—or, at the very least, with a reckless disregard of whether it would mislead—the magistrate judge."  *Id.* at 390 (Order, filed Apr. 25, 2016).  And, second, the district court found the omission of the letter to be material, because an explanation that "DORA had investigated the health care fraud allegations, subsequently decided not to sustain the health care fraud charges, and issued the Admonition letter . . . *would have vitiated probable cause* to search the Atlas/SpineMed Office and Storage Unit . . . for evidence of *that* crime," i.e., healthcare fraud.  *Id.* at 391 (emphases added).  The district court concluded, however, that the affidavit "set[] forth facts establishing probable cause of tax evasion," *id.* at 392, but ultimately deemed "the valid portions of the warrant (tax evasion)" inseverable "from the invalid portions of the warrant (health care fraud),"

12

*id.* at 394.[5]  Accordingly, the district court reasoned that "[t]he search warrants must be voided completely and the fruits of the searches suppressed in their entirety."  *Id.*  The government timely filed this interlocutory appeal from the suppression ruling.

## III

Under *Franks v. Delaware*,

> [w]e exclude evidence discovered pursuant to a search warrant when (1) a defendant proves by a preponderance of the evidence "the affiant knowingly or recklessly included false statements in or omitted material information from an affidavit in support of a search warrant and (2) after excising such false statements and considering such material omissions we conclude the corrected affidavit does not support a finding of probable cause."

*United States v. Campbell*, 603 F.3d 1218, 1228 (10th Cir. 2010) (alterations omitted) (quoting *United States v. Garcia–Zambrano*, 530 F.3d 1249, 1254 (10th Cir. 2008)); *see also United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997).  "The standards of deliberate falsehood and reckless disregard set forth in *Franks* apply to material omissions as well as affirmative falsehoods."  *United States v. Ruiz*, 664 F.3d 833, 838 (10th Cir. 2012) (quoting *United States v. McKissick*, 204 F.3d 1282, 1297 (10th Cir. 2000)).  "An omission is material if it is

---

[5]    In reaching the severability determination, the district court questioned "whether the severability doctrine applies to a *Franks* challenge," and construed the affidavit as comprised of valid and invalid "portion[s]" but without specifying any dividing line.  Aplt.'s App., Vol. II, at 394.  The parties substantively discuss these findings on appeal, but our resolution of this appeal on materiality grounds obviates the need to resolve these severability questions.

'so probative as to negate probable cause.'" *Id.* (quoting *Stewart v. Donges*, 915 F.2d 572, 582 n.13 (10th Cir. 1990)).

Probable cause exists to support a search warrant when, "given all the circumstances set forth in the affidavit . . ., there is a *fair probability* that contraband or evidence of a crime will be found in a particular place." *United States v. Artez*, 389 F.3d 1106, 1111 (10th Cir. 2004) (emphasis added) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause does not require a showing of "proof beyond a reasonable doubt or by a preponderance of the evidence." *See id.* (quoting *Gates*, 462 U.S. at 235); *see also Spinelli v. United States*, 393 U.S. 410, 419 (1969) ("[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."), *abrogated on other grounds by Gates*, 462 U.S. at 238. Probable cause is not a rigid formula, but rather a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232; *see also United States v. Leon*, 468 U.S. 897, 958 (1984) (Brennan, J., dissenting) (probable cause is a "relaxed standard").

An "affidavit in support of a search warrant must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." *United States v. Edwards*, 813 F.3d 953, 960 (10th Cir. 2015) (quoting *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000)). We simply must make a "practical, common-sense determination," *id.*,

14

whether, under the totality of the circumstances presented in the affidavit, there is a "*substantial basis*" to conclude that "there is a *fair probability* that contraband or evidence of a crime will be found will be found in a particular place." *United States v. Long*, 774 F.3d 653, 658 (10th Cir. 2014) (emphases added) (quoting *Gates*, 462 U.S. at 236, 238); *cf. United States v. Martin*, 426 F.3d 68, 77 (2d Cir. 2005) ("The fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause.").

As for a district court's ruling regarding suppression after a *Franks* hearing, "we review for clear error the district court's findings regarding the truth or falsity of statements in the affidavit and regarding the intentional or reckless character of such falsehoods." *Ruiz*, 664 F.3d at 838 (quoting *Garcia-Zambrano*, 530 F.3d at 1254). However, we "review the district court's ultimate determination that the corrected affidavit supports a finding of probable cause de novo." *Campbell*, 603 F.3d at 1228. It ineluctably follows that this same standard (i.e., de novo) governs our review of a district court's essentially obverse ruling that the omitted information, which is incorporated into the corrected affidavit, *is material—viz.*, the court's ruling that the information "is 'so probative as to negate probable cause.'" *Ruiz*, 664 F.3d 833, 838 (quoting *Stewart*, 915 F.2d at 582 n.13); *see United States v. Ippolito*, 774 F.2d 1482, 1484 (9th Cir. 1985) ("The ultimate question, whether the misstatements are material, . . . should be reviewed de novo.").

15

**IV**

The district court's suppression decision was based on a series of sequential determinations: *first*, the district court concluded that Agent Rutkowski intentionally or recklessly misled the magistrate judge through his omission of DORA's Admonition Letter; *second*, the court found that Agent Rutkowski's omission was material, because the letter's inclusion would have vitiated probable cause to search for evidence with respect to the healthcare-fraud offenses; *third*, the court opined that the affidavit contained independent probable cause for the tax-based offenses, even if the affidavit included DORA's Admonition Letter; and *finally*, the court found that the valid tax-related portions of the warrant could not be severed from the invalid healthcare-focused portions.

On appeal, the government challenges only the district court's severability and materiality determinations, arguing that the district court committed reversible error "in holding that the tax portion of the warrant in this case was not severable," Aplt.'s Opening Br. at 14, and that the court also erred when it "characterized the admonition letter as a finding of 'not guilty' to the fraud allegations," and that the letter was actually immaterial "to the probable cause for the suspected healthcare offenses," *id.* at 15. Defendants strongly disagree, contending that the "valid portions of the warrant are not sufficiently distinguishable from the invalid portions to permit severance," Aplees.' Response Br. at 31, and that the government's

16

materiality argument is "meritless," *id.* at 38 (capitalization altered).[6]

Although the parties' appellate briefing places greater emphasis on the district court's severability determination, we conclude that the court erred in its materiality determination. This conclusion is sufficient to resolve this appeal. Specifically, by concluding that Defendants have not shown that the Admonition Letter was material to the probable-cause determination regarding the healthcare-

---

[6] We note that Defendants begin their attack on the government's materiality argument by claiming that it is "waived." Aplee.'s Response Br. at 38 (capitalization altered). However, this argument is patently misguided and merits little attention. Specifically, Defendants argue that the government "conceded the issue of materiality" through a "Notice of Clarification" that the government filed after the *Franks* hearing. Aplees.' Response Br. at 39. The "Notice of Clarification" stated that,

> [i]n reviewing the transcript of the hearing, undersigned counsel became concerned that the government's focus on materiality may have been understood as signaling approval of the agent's decision to omit the letter. *The government recognizes that the warrant affidavit should have included information about DORA's resolution of a claim.* It believes that the omission was the result of poor judgment by a new agent, and nothing more. But regardless of the agent's intention, the information should have been included.

Aplees.' Suppl. App. at 1 (emphasis added) (Gov't's Notice of Clarification, filed Apr. 15, 2016). Seizing on the "should have included" language, Defendants argue that the "government's clarification conceded . . . that information about the Admonition Letter" was *material* to the probable cause determination. Aplees.' Response Br. at 39. Not so. Nothing in the government's clarification suggests it was conceding the materiality of the Admonition Letter. On the contrary, the notice restates "the government's focus on materiality." Aplees.' Suppl. App. at 1. At most, the notice could be read as a concession by the government that the DORA letter was *relevant* (as opposed to material)—and, consequently, should have been included in the affidavit for the magistrate judge's consideration—and that the Admonition Letter was omitted with reckless disregard (the first prong of *Franks*). Neither the relevancy of the letter nor the agent's intent, however, is at issue here.

fraud offenses, we are essentially saying that Agent Rutkowski's inclusion of the Admonition Letter in the affidavit would *not* have vitiated the probable cause regarding these offenses. And the affidavit's probable-cause showing regarding the tax-related offenses is not at issue here. Consequently, our decision to overturn the district court's materiality determination, related to the healthcare-fraud portion of the affidavit, effectively rejects the only challenge to the probable-cause basis of the affidavit, and this provides a sufficient basis for reversing the district court's suppression order.

## A

The Admonition Letter was indisputably relevant and should have been included in Agent Rutkowski's affidavit; however, relevance does not equate to materiality. In our view, the letter was not "so probative as to negate probable cause." *Ruiz*, 664 F.3d at 838. In concluding otherwise, the district court erred in at least two ways. First, it imparted a meaning to the letter that simply is not evident on its face. Second, it focused solely on the letter, rather than the totality of the circumstances, when evaluating the corrected affidavit.

## 1

The Admonition Letter does not draw *any* conclusions or make *any* findings regarding the healthcare-fraud allegations that precipitated DORA's investigation.[7]

---

[7]     Defendants do not even attempt to dispute that DORA did not make

(continued...)

18

In spite of this, the district court construed the letter as an affirmative adjudication of these allegations. Indeed, during the *Franks* hearing, the district court described the Admonition Letter as a finding that Dr. Carlson "was not guilty" of healthcare fraud. Aplt.'s App., Vol. II, at 368. In its suppression decision, moreover, the district court reiterated the same belief, stating that "DORA did not sustain the health care fraud charges that it investigated." *Id.* at 389; *accord id.* (finding that "DORA examined and investigated those allegations and did not sustain the health care fraud charges").

We discern no significant basis in the text of the Admonition Letter for the meaning the district court attributed to it. True, the letter states that it is a "full and final resolution of the issues raised in" the case before it—which was premised on healthcare-fraud allegations—and DORA ultimately did not take action against Dr. Carlson for healthcare fraud. But aside from referencing the case, the letter is silent regarding the healthcare-fraud allegations. It does not describe the allegations. It does not state what evidence DORA considered. It does not state what findings, if any, DORA made regarding the healthcare-fraud allegations.

---

[7](...continued)
"specific findings about alleged healthcare fraud" in the Admonition Letter. Aplee.'s Response Br. at 40 n.10. Nor could they. They simply ask us to follow the district court's lead by inferring from this decisional silence that DORA exculpated Dr. Carlson and his related entities with respect to the healthcare-fraud allegations. In this regard, they tell us that it matters not "why DORA might have resolved its investigation" of these allegations in this manner, "[w]hat matters" is that it did so. *Id.* As we explain *infra*, we are not persuaded.

19

And, most importantly, it does not state that, after considering all of the evidence

before it, DORA found the healthcare-fraud allegations to be meritless.

The letter appears to be a quasi-settlement, and is seemingly drafted in an

intentionally vague manner as a result. The district court even acknowledged that

"in some sense the Admonition Letter is a 'settlement letter.'"[8] *Id.* at 389. Yet, the

court then seemed to conflate the relevance of the letter—which is uncontested

here—with its materiality. It is not clear why the district court believed that a state

licensing board's unexplained decision to settle a case would vitiate probable cause

for the underlying criminal conduct that gave rise to the case. Generally,

settlement provides a means of efficiently resolving a case without incurring the

expense of litigation,[9] but it does not typically involve an adjudication on the

---

[8]     The Admonition Letter states, "Pursuant to agreement with [DORA], you have agreed to waive the right provided by § 12-33-119(a), C.R.S., to contest this Letter of Admonition through a formal disciplinary proceeding and appeal." Aplt.'s App. at 147.

[9]     DORA is authorized to discipline licensees for violations of state healthcare-fraud laws. *See* COLO. REV. STAT. § 12-33-117(1)(k) ("[T]he board may issue a letter of admonition to a licensee or may revoke, suspend, deny, refuse to renew, or impose conditions on such licensee's license . . . [for] [v]iolation [or] abuse of health insurance pursuant to COLO. REV. STAT. § 18-13-119 [i.e., criminal healthcare fraud], or commission of a fraudulent insurance act, as defined in COLO. REV. STAT. § 10-1-128 [i.e., civil insurance fraud] . . . ."). However, Dr. Carlson and his affiliated entities would have been entitled to a formal hearing to challenge any such allegations, at which DORA would bear the burden of proof. *See id.* § 12-33-119(9)(a) (giving recipients of admonition letters the "right to . . . formal disciplinary proceedings . . . to adjudicate the propriety of the conduct upon which the letter of admonition is based"); *id.* § 12-33-119(4) ("Disciplinary proceedings and hearings shall be conducted in the manner prescribed by [COLO. REV. STAT. § 24-4-105]."); *id.* § 24-4-105(7) ("[T]he proponent of

(continued...)

20

merits of all matters within the scope of the case, let alone a *sub silentio* adjudication of these matters.

Moreover, it strains credulity to believe that the explicit and strong suggestions of healthcare fraud communicated by Dr. Elder in his report prior to the release of DORA's Admonition Letter could have been addressed and rejected by DORA through such silence. Specifically, Dr. Elder strongly suggested that Dr. Carlson and his affiliated entities were involved in healthcare fraud. Indeed, although the limited documentation provided by Dr. Carlson constrained Dr. Elder from reaching a conclusive determination, he found evidence of a scheme that "involved the patient paying cash to Dr. Carlson, as well as him receiving insurance reimbursement . . . for the same services," without redistributing the "alleged insurance payments . . . to the patients." Aplt.'s App., Vol. I, at 275. Dr. Elder then expressed his belief that "Dr. Carlson and/or his attorney were *intentionally trying to defraud* [DORA]," *id.* (emphasis added), and suggested that Dr. Carlson's "absolute[]" failure to maintain financial records "warrant[ed] possible consultation with the Internal Revenue Service," *id.* at 276. If DORA had

[9](...continued)
an order shall have the burden of proof."). And that burden would have been by a preponderance of the evidence. *See id.* § 24–4–105(7) ("The rules of evidence and requirements of proof shall conform, to the extent practicable, with those in civil nonjury cases in the district courts."); *id.* § 13–25–127(1) ("[T]he burden of proof in any civil action shall be by a preponderance of the evidence."); *see generally Gerner v. Sullivan*, 768 P.2d 701, 703–04 (Colo. 1989) (en banc) (discussing the burden-of-proof requirements of § 13–25–127(1)).

actually tackled and rejected these very serious allegations from the person it charged and entrusted with conducting the misconduct investigation (i.e., Dr. Elder) we find it hard to believe that it would have done so through silence.[10]

To be sure, Defendants suggest that we should defer under a clear-error standard of review to the district court's "characterization" of DORA's Admonition Letter, Aplee.'s Response Br. at 40—specifically, as a finding that Dr. Carlson "was not guilty" of the healthcare-fraud allegations, Aplt.'s App., Vol. II, at 368. This suggestion, however, is misguided. The district court's interpretation of the meaning of the DORA letter was inextricably intertwined with its materiality determination. And our standard of review of a materiality determination—that is, whether the information in a corrected affidavit (here, the DORA Admonition Letter) "is 'so probative as to negate probable cause'"—is de novo. *Ruiz*, 664 F.3d at 838 (quoting *Stewart*, 915 F.2d at 582 n.13); *see Ippolito*, 774 F.2d at 1484. Accordingly, it logically and necessarily follows that our consideration of the meaning of the DORA Admonition Letter also must be de novo. Moreover, applying the standard of review that is typically associated with legal

---

[10] It seems much more likely that, because Dr. Elder could not definitively bring to a close the "aspect of the case" involving double-billing and other healthcare fraud, because of the "great deal of essential documentation that was missing from every file" that Dr. Carlson supplied during the investigation, DORA decided to side-step the issue of healthcare fraud and secure instead Dr. Carlson's agreement not to contest a disciplinary sanction for the clear and concrete record-keeping violations that Dr. Elder unearthed. Aplt.'s App., Vol. I, at 275–76.

22

questions—i.e., de novo—seems most appropriate for our consideration of the meaning of DORA's Admonition Letter, for it is effectively a settlement agreement. *See, e.g.*, *Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 831–32 (10th Cir. 2005) (noting that "[t]he general rules of contract interpretation under state law apply to settlement agreements" and that, under Utah law, "[e]ven if the court refers to extrinsic evidence to make th[e] determination, contractual ambiguity presents a question of law that we review de novo"); *Dillard & Sons, Const., Inc. v. Burnup & Sims Comtec, Inc.*, 51 F.3d 910, 914 (10th Cir. 1995) ("Under Oklahoma law, it is well-settled that the interpretation of an unambiguous contract is a question of law for the court."); *see also* 5 AM. JUR.2d *Appellate Review* § 647, Westlaw (database updated Feb. 2018) (noting that the "[d]eterminations of law subject to plenary review on appeal" include "the proper interpretation of the provisions of a consent decree or settlement agreement, contract, or other written instrument" (footnotes omitted)). Furthermore, even assuming *arguendo* that this interpretive task has some embedded, appreciable factual component, we have no doubt that the task still "entails *primarily* legal . . . work" and, therefore, de novo review nevertheless would be appropriate. *U.S. Bank Nat'l Ass'n ex rel. CW Capital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, --- U.S. ----, 138 S. Ct. 960, 967 (2018) (emphasis added). Applying that standard, we conclude that the district court erred in construing the DORA Admonition Letter as a finding that Dr. Carlson was "not guilty" of healthcare fraud. Aplt.'s

23

App., Vol. II, at 368.

**2**

The district court also erred in failing to consider "all the circumstances set forth in the [corrected] affidavit," *Artez*, 389 F.3d at 1111; instead, it focused solely on the Admonition Letter. After citing the general standard for probable cause the court simply concluded in one sentence that,

> had the affidavit explained that DORA had investigated the health care fraud allegations, subsequently decided not to sustain the health care fraud charges, and issued the Admonition Letter, then that information would have vitiated probable cause to search the Atlas/SpineMed Office and Storage Unit 412 for evidence of that crime.

Aplt.'s App., Vol. II, at 391. The court did not weigh the letter—even under its erroneous interpretation of its meaning—against the other evidence of healthcare fraud included in the affidavit. Rather, the court essentially accorded dispositive effect to DORA's admonition letter. This was error. A proper probable-cause determination requires consideration of "the *totality* of the information" contained in the affidavit. *Barajas*, 710 F.3d at 1108 (emphasis added) (quoting *Roach*, 582 F.3d at 1200). Put differently, a determination of "whether probable cause exists to support a search warrant" requires engagement with "*all* the circumstances set forth in the affidavit." *Artez*, 389 F.3d at 1111 (emphasis added) (quoting *Gates*, 462 U.S. at 238). The district court's failure to engage in this way was error and likely resulted in the court reaching the wrong conclusion (as discussed *infra*) regarding

24

the materiality of the Admonition Letter.  In any event, once we consider "all the circumstances set forth in the affidavit," including the Admonition Letter, we conclude *infra* that there is at least a "substantial basis" to conclude that there was a "fair probability" that evidence of healthcare fraud would be found at Atlas, SpineMed and the storage unit.  *Long*, 774 F.3d at 658 (quoting *Gates*, 462 U.S. at 236, 238).

## B

In our probable cause determination, we consider whether "all the circumstances set forth in the affidavit" give rise to "a fair probability that contraband or evidence" will be found in the places specified to be searched. *Artez*, 389 F.3d at 1111 (quoting *Gates*, 462 U.S. at 238).  Here, based on our review of Agent Rutkowski's affidavit—corrected to include DORA's Admonition Letter—we conclude that there was a fair probability that evidence of healthcare fraud would be found at Atlas, SpineMed, and the storage unit.  Under our reading of the Admonition Letter, explicated *supra*, we arrive at this conclusion with no difficulty.  We acknowledge that the conclusion would be somewhat less patent if we adopted the district court's erroneous reading of the Admonition Letter—that is, as an affirmative (albeit silent) determination that Dr. Carlson and his related entities were not culpable for the investigated healthcare fraud; however, we nevertheless would arrive at the same destination, given the abundance of evidence of potential healthcare fraud that Agent Rutkowski detailed in his affidavit.

25

Because the inclusion of the Admonition Letter in the (corrected) affidavit would not have negated probable cause of healthcare fraud—under our interpretation, or even the district court's—the letter cannot be material. And the district court erred by concluding to the contrary.

Turning to the ample evidence of healthcare fraud found in the affidavit, we highlight the following, substantively salient paragraphs (numbered as they appear in Agent Rutkowski's affidavit):

13. During the course of this investigation, records were obtained from United Healthcare (United) *relating to a patient complaint regarding double billing*. Specifically, in December 2007, United received a fraud hotline tip from a patient of Carlson's alleging Carlson charged the patient $3,500.00 up front for services that he told the patient United would not cover. Later, the patient received her explanation of benefits (EOBs) from United showing that Carlson did submit billings to United for the services and failed to reimburse the patient for the overpayments. *The patient confronted Carlson about the double billing and he admitted he had done this*. When the patient requested a reimbursement check, he stated that he didn't do anything wrong. Nevertheless, Carlson gave the patient $1,700.00 of the $3,500.00.

14. Subsequent to the fraud hotline tip, United's Special Investigative Unit, Ingenix, initiated an investigation into the billing practices of Carlson, Atlas, and SpineMed. Ingenix determined through ten more patient interviews that Carlson received upfront payments for a treatment plan from nine of the ten patients. Carlson charged these patients approximately $3,500.00 each for the treatment plans and advised each patient the treatment would not be covered by United. *However, Carlson did bill United, retained the insurance reimbursements, and failed to reimburse the nine patients.*

15. Ingenix also learned through the patient interviews the patients received Vax-D/Decompression Table Therapy. Vax-D/Decompression Table therapy is a non-covered service by United. Ingenix found that Carlson, Atlas, and SpineMed submitted billings for Vax-D/Decompression Table Therapy under codes other than the appropriate code in order to obtain payment for this non-covered treatment. *Ingenix alleged Carlson, Atlas, and SpineMed billed under twelve other codes to mask, disguise, and misrepresent the services actually rendered. Ingenix's analysis disclosed a total of $460,338.10 was possibly paid in error due to these misrepresentations.*

16. Ingenix also determined Carlson, Atlas, and SpineMed submitted *duplicate billings and triplicate billings* for services provided under both Carlson's name and one or both of the business names.

. . . .

23(e). The persons listed in the "Patient List" contained within Attachment B, numbered 254–262, represent a list of persons identified by Ingenix, and subsequently investigated by the Colorado State Board of Chiropractic. According to the investigation performed by Ingenix and The Colorado State Board of Chiropractic, *there is a likelihood the Doctors submitted billing to United Healthcare for these patients multiple times under various company names and Employer Identification Numbers, constituting the illegal practice known as double-billing.*

. . . .

29(b). Dr. Elder requested the attorney review patient contracts for Vax-D treatment and the attorney responded that all contracts were *verbal*. Dr. Elder found this highly unusual *considering the large amounts of cash required from patients to pay for the treatments*.

29(c). *No patient records contained a diagnosis.* The only

27

diagnosis Dr. Elder could find was contained on the claim forms submitted by Dr. Carlson to United Healthcare. *Dr. Elder found no documentation in any file to justify why the patients needed Vax-D treatment and speculated that most patients were existing patients and that after Carlson purchased the Vax-D tables, the patients were all of a sudden candidates for Vax-D without proper work-up or establishing the medical necessity of the treatment.*

29(d). Dr. Elder found evidence that Dr. Carlson *billed United Healthcare for Vax-D treatments under different procedural codes* and also determined *numerous cases involved duplicate billing* as alleged by United Healthcare.

. . . .

29(f). In comparing the patient files to the claim forms received by United Healthcare, Dr. Elder found the United Healthcare claims showed *nearly every patient had a diagnosis of stenosis in the lumbar and thoracic spines yet there was absolutely no documentation to justify such a diagnosis in the patient file*.

29(g). Dr. Elder found that well over 100 patient visits were billed to United Healthcare, yet Dr. Carlson's patient files contained absolutely *no documentation or records for the dates of service as billed.*

Aplt.'s App., Vol. I, at 63–64, 68, 71–73 (emphases added).

Simply stated, Agent Rutkowski's affidavit contained detailed allegations of healthcare fraud from two independent reviews of Defendants' files—one by United and the other by Dr. Elder, an expert that DORA retained for purposes of investigating the allegations of healthcare fraud. Importantly, both of these reviews concluded that there was at least a "likelihood," *id.* at 73, that Dr. Carlson, Atlas, and SpineMed were submitting fraudulent claims to United and other

28

insurers— i.e., engaging in healthcare fraud. It is patent that, standing alone, these allegations would have presented to the magistrate judge "a fair probability that contraband or evidence" of healthcare fraud would be found at Atlas, SpineMed and the storage unit, *Artez*, 389 F.3d at 1111 (quoting *Gates*, 462 U.S. at 238). And, though unquestionably relevant, we conclude that DORA's Admonition Letter—as we understand it—would not have had an appreciable effect on the probable-cause calculus. More specifically, we conclude that the letter would not have negated probable cause and, therefore, was not material. The Admonition Letter did not address the healthcare fraud allegations, did not state that there was insufficient evidence to pursue them, and certainly did not bless Defendants' billing practices. It simply identified a distinct, record-keeping violation and disciplined Dr. Carlson for it. Under our view of the letter, it was not material.

Moreover, even under the district court's erroneous interpretation of DORA's Admonition Letter, we would reach the same conclusion, given the expansive and detailed evidence in the affidavit that strongly suggested that Defendants had committed healthcare fraud. Admittedly, the decisional outcome would be less crystal clear, given that the district court interpreted the Admonition Letter as an affirmative determination by DORA that Dr. Carlson and his related entities were not culpable with respect to the investigated allegations of healthcare fraud. But that determination would have constituted just one data point, which the magistrate judge would have weighed against all of the other affidavit evidence, in

29

applying the fair-probability standard—including evidence of two independent investigations that reached conclusions contrary to the one we attribute here to DORA, regarding Dr. Carlson's involvement in healthcare fraud.

Indeed, in cases where panels of our court—including a panel in a precedential decision—have properly considered the totality of the affidavit evidence and found that it pointed with some strength in favor of a finding of criminal conduct under the fair-probability standard, analogous omissions of seemingly exculpatory evidence have been deemed *not* material. *See United States v. McKissik*, 204 F.3d 1282, 1288–89, 1297–98 (10th Cir. 2000) (holding that where detective "stated in the affidavit that he had personally observed the bag of cocaine in plain view in the car when he looked at the sealed car in the impoundment lot," "the facts contained in the affidavit would have supported the issuance of a search warrant even if [the detective] had noted the other officers failed to mention the cocaine they observed in plain view in their reports"); *see also United States v. Wright*, 350 F. App'x 243, 247–48 (10th Cir. 2009) (unpublished) (concluding that a detective's omission of "several unsuccessful attempts to corroborate allegations" of drug activity against the defendant was immaterial, because the affidavit independently established probable cause through anonymous complaints and confidential informants and information regarding defendant's "failure to report income to federal and state tax agencies for a number of years"); *United States v. Brinlee*, 146 F. App'x 235, 239 (10th Cir. 2005)

30

(unpublished) (holding that an officer's omission of details that allegedly could have led the magistrate judge to infer from "[a cooperating witness's] behavior that she was under the influence of drugs or had a motive to lie," was not material where "the affidavit contained detailed descriptions given by [the witness] along with information from other sources, which enhanced her credibility and corroborated her statements about the presence of drugs in the house"); *United States v. Hutto*, 84 F. App'x 6, 8 (10th Cir. 2003) (unpublished) (concluding that a "factual inaccuracy" in an affidavit was immaterial, because the "affidavit contain[ed] several facts that combine[d] to support a finding of probable cause"); *United States v. Kiister*, 208 F.3d 227, *6 (10th Cir. 2000) (unpublished) (concluding that a detective's omission of prior searches that failed to reveal "drugs or indisputable evidence of drug trafficking" was immaterial, because other information in the affidavit "overwhelmingly provided probable cause for the issuance of a warrant, even [with] the omitted material").[11]

Finally, our conclusion that DORA's Admonition Letter was not material is fortified by our recognition that, even assuming DORA exculpated Dr. Carlson and his related entities of the investigated allegations of healthcare fraud in its Admonition Letter, DORA would have been making that decision under a different,

---

[11]    Although nonprecedential, we find the foregoing decisions by panels of our court persuasive to the extent they address analogous omissions under a *Franks* analysis.

31

higher standard of proof than probable cause—specifically, a preponderance-of-the-evidence standard. *Compare* COLO. REV. STAT. § 24-4-105(7) ("The rules of evidence and requirements of proof shall conform, to the extent practicable, with those in civil nonjury cases in the district courts."), *and id.* § 13–25–127(1) ("[T]he burden of proof in any civil action shall be by a preponderance of the evidence."), *with Artez*, 389 F.3d at 1111 (noting that probable cause does not require a showing of "proof beyond a reasonable doubt *or by a preponderance of the evidence*" (emphasis added) (quoting *Gates*, 462 U.S. at 235)), *and United States v. Patane*, 304 F.3d 1013, 1018 (10th Cir. 2002) (explaining that probable cause "*does not require certainty of guilt or even a preponderance of evidence of guilt*, but rather only reasonably trustworthy information that would lead a reasonable person to believe an offense was committed" (emphasis added)), *rev'd on other grounds*, 542 U.S. 630 (2004).

Therefore, DORA's ostensibly exculpatory finding regarding the healthcare-fraud allegations would not be logically inconsistent with a determination by the magistrate judge that, considering the totality of the circumstances, there was probable cause to criminally investigate those same or similar allegations. Put another way, even assuming *arguendo* that it is reasonable to infer from DORA's Admonition Letter that the agency considered the healthcare-fraud allegations and decided that it could not establish them in a formal action—thus, effectively exculpating Dr. Carlson—that would not necessarily mean that a magistrate judge

32

could not have reasonably concluded that there was probable cause to believe that criminal offenses related to those allegations had been committed. And, more to the point, Defendants have failed to make an adequate showing that the magistrate judge could not have reached this probable-cause conclusion.

In sum, for the foregoing reasons, we conclude that the district court erred in finding that DORA's Admonition Letter was material—*viz.*, "so probative as to negate probable cause." *Ruiz*, 664 F.3d at 838 (quoting *Stewart*, 915 F.2d at 582 n.13); *see Ippolito*, 774 F.2d at 1484. Because the court ultimately based its decision to grant Defendants' suppression motion on this materiality finding, its suppression order cannot stand.

## V

Based on the foregoing, we **REVERSE** the district court's suppression order on materiality grounds, and **REMAND** for further proceedings consistent with this Order and Judgment.

ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge

33